

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-5-1995

# Hatco v WR Grace

Precedential or Non-Precedential:

Docket 94-5276

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"Hatco v WR Grace" (1995). *1995 Decisions.* Paper 181.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/181

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 94-5276
_____


HATCO CORPORATION,
                              Appellee
                    v.

    W.R. GRACE & CO.--CONN., a Corporation
     of the State of Connecticut,
              Defendant and Third-Party Plaintiff

                         v.

ALLSTATE INSURANCE COMPANY (as successor to Northbrook
Excess and Surplus Company); AMERICAN EMPLOYERS'
INSURANCE COMPANY; CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON AND THE LONDON MARKET COMPANIES; COMMERCIAL
UNION INSURANCE COMPANY; CONTINENTAL CASUALTY COMPANY;
PACIFIC EMPLOYERS INSURANCE COMPANY; UNIGARD SECURITY
INSURANCE COMPANY,

                              Third-Party Defendants
                    and

     COMMERCIAL UNION INSURANCE COMPANY,
     Third-Party Defendant and Fourth-Party Plaintiff

                         v.

     MARYLAND CASUALTY COMPANY,
     Fourth-Party Defendant and Fifth-Party Plaintiff

                         v.

AMERICAN CENTENNIAL INSURANCE COMPANY; EVANSTON
INSURANCE COMPANY; FIRST STATE INSURANCE COMPANY;
GIBRALTAR CASUALTY COMPANY; HARTFORD CASUALTY INSURANCE
COMPANY; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND
THE LONDON MARKET COMPANIES; MIDLAND INSURANCE COMPANY;
RELIANCE INSURANCE COMPANY; REPUBLIC INSURANCE COMPANY;
ROYAL INDEMNITY COMPANY; TRANSPORT INDEMNITY, a/k/a
MISSION AMERICAN INSURANCE COMPANY; TWIN CITY FIRE
INSURANCE COMPANY,

                              Fifth-Party Defendants

          W.R. GRACE & CO.--CONN., Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. No. 89-cv-01031)

Argued January 25, 1995

Before:  MANSMANN, HUTCHINSON, and WEIS, Circuit Judges

Filed   July 5, 1995

Anthony J. Marchetta, Esquire (ARGUED)
Robert G. Rose, Esquire (ARGUED)
Elizabeth J. Sher, Esquire
PITNEY, HARDIN, KIPP & SZUCH
P.O. Box 1945
Morristown, NJ 07962-1945

Attorneys for Appellant


Aubrey M. Daniel, III, Esquire (ARGUED)
Paul Mogin, Esquire
Evan J. Roth, Esquire
Eric M. Braun, Esquire
Dane H. Butswinkas, Esquire
Stephen D. Sencer, Esquire
WILLIAMS & CONNOLLY
725 12th Street, N.W.
Washington, DC  20005

Robert M. Goodman, Esquire
CARPENTER, BENNETT & MORRISSEY
3 Gateway Center
Newark, NJ  07102

Attorneys for Appellee

OPINION OF THE COURT


WEIS, Circuit Judge.

In this case, the buyer of a chemical plant has sued the seller under state law and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675, for costs incurred in abating contamination at the site. The district court, applying federal common law, held that the sale agreement between the parties did not clearly relieve the seller from a duty to contribute and, after a trial, entered judgment for the buyer. We conclude that state law governs the interpretation of the contract and requires consideration of extrinsic evidence to resolve ambiguities. We agree with the district court that the parties are not entitled to a jury trial under CERCLA. Accordingly, we will vacate the judgment in favor of the buyer and remand for a hearing on the contractual issues.

In 1959, W.R. Grace & Co.--Conn. acquired a chemical manufacturing business in Fords, New Jersey. Grace owned and operated the plant until 1978 when it sold the operation to the straw-parties that, in turn, transferred the business to Hatco Corporation, whose sole shareholder was and is Alex Kaufman.[1]

Kaufman had worked at the Fords site for over twenty years and served as the president of Grace's chemical division there from 1962 until the sale in 1978. At the time of the sale, the site was polluted by the manufacturing operations that had

---

[1]. The parties have made no distinction between Hatco and its corporate predecessors to whom Grace had originally sold the plant. We will therefore treat Hatco as if it were the original purchaser.

been carried on over the years.  Additional contamination occurred during the subsequent years when Hatco owned the facility.

Under pressure from state authorities, Hatco undertook cleanup operations at the site and then sued for reimbursement of sums expended, alleging liability against Grace under CERCLA and the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J. Stat. Ann. §§ 58:10-23.11 to -23.24.  Contending that Hatco had assumed responsibility for cleanup in the 1978 agreement of sale, Grace moved for summary judgment.  Hatco filed a cross-motion on the same issue.  The district court denied Grace's motion on that issue and granted Hatco's, concluding that the agreement, as a matter of law, did not unambiguously shield Grace from Hatco's claim for reimbursement.

In a nonjury trial, the district court found both Grace and Hatco responsible under the New Jersey Spill Act and CERCLA. The court apportioned the cleanup costs between the two companies based on a number of factors and entered judgment in favor of Hatco and against Grace in the amount of $9,269,892.41, plus prejudgment interest of $2,919,885.75, for a total of $12,189,778.16.  The proceedings before the district court have been chronicled in a series of published opinions.[2]

_____

[2]. Hatco Corp. v. W.R. Grace & Co.--Conn., 859 F. Supp. 769 (D.N.J. 1994); Hatco Corp. v. W.R. Grace & Co.--Conn., 849 F. Supp. 987 (D.N.J. 1994); Hatco Corp. v. W.R. Grace & Co.--Conn., 849 F. Supp. 931 (D.N.J. 1994); Hatco Corp. v. W.R. Grace & Co.--Conn., 836 F. Supp. 1049 (D.N.J. 1993), modified, 849 F. Supp. 987 (D.N.J. 1994); Hatco Corp. v. W.R. Grace & Co.--Conn., 801 F. Supp. 1334 (D.N.J. 1992); Hatco Corp. v. W.R. Grace & Co.--Conn., 801 F. Supp. 1309 (D.N.J. 1992).

Although unresolved claims between the parties remain (including potential insurance coverage), the court entered final judgment pursuant to Fed. R. Civ. P. 54(b). Grace has appealed, raising a number of issues, one of which we find is dispositive of this appeal.

I.

Under CERCLA, 42 U.S.C. § 9607(e), "agreements to indemnify or hold harmless are enforceable between [private] parties but not against the government." Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 89 (3d Cir. 1988); accord Beazer East, Inc. v. Mead Corp., 34 F.3d 206, 211 (3d Cir. 1994), cert. denied, 115 S. Ct. 1696 (1995). Although these private agreements cannot nullify a party's underlying CERCLA liability, they are effective to shift the ultimate financial loss. Beazer, 34 F.3d at 211; Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1459 (9th Cir. 1986).

Grace contends that it is not required to reimburse Hatco for cleaning up the Fords site because in the agreement of sale between the parties, Hatco assumed the obligation of satisfying any environmental obligations. Following its earlier opinion in Mobay Corp. v. Allied-Signal, Inc., 761 F. Supp. 345 (D.N.J. 1991), the district court held that in order to create a duty to indemnify under federal common law, "an unmistakable intent to do so must be expressed in unambiguous terms or be clearly implied." Hatco Corp. v. W.R. Grace & Co.--Conn., 801 F. Supp. 1309, 1318 (D.N.J. 1992).

However, some months after this appeal was taken, we held that agreements among private parties inter se addressing the allocation of responsibility for CERCLA claims are to be interpreted by incorporating state, not federal, law. Fisher Dev. Co. v. Boise Cascade Corp., 37 F.3d 104, 109 (3d Cir. 1994); Tippins, Inc. v. USX Corp., 37 F.3d 87, 91 n.4 (3d Cir. 1994); Beazer, 34 F.3d at 215. We have also decided that, given appropriate language, a pre-CERCLA agreement can be effective for claims arising after the statute became effective. Fisher, 37 F.3d at 110; Beazer, 34 F.3d at 211.

The sale agreement before us provides that its terms are to be interpreted by the laws of New York. Under that state's law, the assignment of the burden of proof depends upon whether the agreement in question is characterized as a "release" or as an "indemnity" contract. Compare, e.g., Structural Painting Corp. v. Travelers Indemnity Co., 451 N.Y.S.2d 875, 876 (N.Y. App. Div. 1982) (burden of establishing intent of parties is assigned to releasor) with Walsh v. Morse Diesel, Inc., 533 N.Y.S.2d 80, 83 (N.Y. App. Div. 1988) (burden of establishing intent of parties is assigned to indemnitee).

In the case before us, the district court and the parties on appeal have used the terms "release" and "indemnity" interchangeably. Under the Mobay standard, perhaps that made no difference, but it is otherwise under Beazer. As we remarked in a CERCLA context, the effect of a release is to shield the beneficiary of that agreement from liability rather than to shift

its responsibility to another as is the case of a contract to indemnify. Fisher, 37 F.3d at 112.

New York law specifies that an indemnity agreement be strictly construed and that a clear and unmistakable intent to indemnify be manifested in the contract. Heimbach v. Metropolitan Transp. Auth., 553 N.E.2d 242, 246 (N.Y. 1990). If the parties' intent is not clear from the writing, the court must consider extrinsic evidence. Commander Oil v. Advance Food Serv. Equip., 991 F.2d 49, 51 (2d Cir. 1993) (applying New York law); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 430 (2d Cir. 1992) (applying New York law); General Mills, Inc. v. Filmtel Int'l Corp., 599 N.Y.S.2d 820, 822 (N.Y. App. Div. 1993).

However, under state law, the agreement here may be more accurately characterized as a release. "To constitute a release, a writing must contain an expression of a present intention to renounce a claim." Carpenter v. Machold, 447 N.Y.S.2d 46, 46-47 (N.Y. App. Div. 1982) (citation omitted). "No particular form need be used in drafting a release . . . ." Pratt Plumbing & Heating, Inc. v. Mastropole, 414 N.Y.S.2d 783, 784 (N.Y. App. Div. 1979). Indeed, "[a]ny words may be used, as long as they manifest the releasor's intent to discharge. The parties' intent will determine the scope of a release." Bank of Am. Nat'l Trust & Sav. Ass'n v. Gillaizeau, 766 F.2d 709, 713 (2d Cir. 1985) (applying New York law) (citations omitted).

Releases are governed by principles of contract law. Mangini v. McClurg, 249 N.E.2d 386, 389 (N.Y. 1969). Whether an agreement is ambiguous is a question of law for the court, W.W.W.

Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990), to be determined by looking to the document as a whole rather than to sentences or clauses in isolation. Williams Press, Inc. v. State, 335 N.E.2d 299, 302 (N.Y. 1975). If an ambiguity in the document prevents a firm conclusion that an agreement is a release, extrinsic evidence may be introduced to resolve that question of fact. Gillaizeau, 766 F.2d at 713-15; see also Green v. Lake Placid 1980 Olympic Games, Inc., 538 N.Y.S.2d 82, 84 (N.Y. App. Div. 1989) (circumstances sufficient to raise issue of fact as to parties' intent permit extrinsic evidence as aid to interpretation of a release).

A factor to be considered in determining whether an agreement is a "release" or an "indemnity" is the type of claim asserted in the litigation. "An action for the breach of an indemnity agreement does not arise until [a party] has suffered damage by reason of the breach." Eliseo v. Stan Margolin Assocs., Inc, 572 N.Y.S.2d 831, 831-32 (N.Y. App. Div. 1991) (citation omitted).[3]

In Bouton v. Litton Indus., Inc., 423 F.2d 643 (3d Cir. 1970), we interpreted New York law in construing a contract for the sale of a business and distinguished between agreements of indemnity and those of assumption. We held that the language of

_____

[3]. Although a claim for indemnity does not arise until the prime obligation to pay has been established, some third-party actions may be commenced in the interest of judicial economy before they are technically ripe. Mars Assocs., Inc. v. New York City Educ. Constr. Fund, 513 N.Y.S.2d 125, 133 (N.Y. App. Div.), appeal dism'd as interlocutory, 514 N.E.2d 391 (N.Y. 1987).

the contract was "that of assumption not of indemnification" and that "one who assumes a liability, as distinguished from one who agrees to indemnify against it, takes the obligation of the transferor unto himself . . . ." Id. at 651.

Although various canons may dictate that an ambiguous agreement is to be construed against one of the parties,[4] such rules are of little consequence when the agreement in question has been "negotiated at arm's length between the representatives of two sophisticated business entities." Hogeland v. Sibley, Lindsay & Curr Co., 366 N.E.2d 263, 266 (N.Y. 1977).

The burden of proof rests on the releasor to establish that general language in the document was meant to be limited "or otherwise does not represent the intent of the parties." Mangini, 249 N.E.2d at 390; see also Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 16 n.4 (2d Cir. 1993) (applying New York law); Mardan, 804 F.2d at 1462 (applying New York law). "[T]he burden of proof is not a necessary concomitant of the burden of pleading" an affirmative defense. Hill v. St. Clare's Hosp., 490 N.E.2d 823, 830 (N.Y. 1986) (citations omitted). "Thus the burden of proof as to the validity of a release is on the defendant who pleads it, but a releasor who seeks to limit

---

[4]. For example, in New York, an ambiguous contract usually is construed most strongly against the drafter when the other party has had no voice in the preparation. Jacobson v. Sassower, 489 N.E.2d 1283, 1284 (N.Y. 1985). By contrast, a release is construed most strongly against the releasor. Mt. Read Terminal, Inc. v. LeChase Constr. Corp., 396 N.Y.S.2d 959, 960 (N.Y. App. Div. 1977).

the effect of a release because of a claimed mutual mistake has the burden of proof on that issue."  Id. (citations omitted).

                                II.

        With this survey of New York law, we now turn our attention to the dispute at hand.  The relevant language in the agreement is:  "[Hatco] hereby assumes and agrees to . . . discharge" certain obligations of Grace.  The agreement has been invoked by Grace, which has not expended any sums for cleanup and makes no claim for them.  Hence, Grace has no basis for indemnity at this point, but in reality is seeking to shield itself from Hatco's claim for reimbursement.

        Hatco is attempting to recover sums it spent to meet Grace's asserted liability.  However, if the agreement is enforceable, it acts to relieve Grace from payment for matters that Hatco had taken over itself when the parties executed the assumption agreement in 1978.  Indeed, as the district court pointed out, to the extent a document of that nature "prevents a purchaser from asserting a CERCLA claim against the seller, the agreement can be viewed as a `release.'"  Hatco, 801 F. Supp. at 1317.  We are in accord with this comment of the district court, and we shall treat the agreement as a release.

        In diversity cases, the burden of proof is a matter of substantive law, Blair v. Manhattan Life Ins. Co., 692 F.2d 296, 299 (3d Cir. 1982), and is not controlled by Fed. R. Civ. P. 8(c), which governs releases pled as affirmative defenses.  See Palmer v. Hoffman, 318 U.S. 109, 117 (1943).  We recognize that the present dispute is not a diversity case, but because the

parties here have chosen to have their agreement interpreted in accordance with New York law, we will apply that state's substantive law on the burden of proof. See Olin, 5 F.3d at 16 n.4; Mardan, 804 F.2d at 1462. Because it contends that the terms of the agreement are unclear, we conclude that the proper course is to require Grace to bear the burden of producing evidence bearing on ambiguity. Hatco, though, as the releasor seeking to limit the effect of the release, bears the burden of persuasion on the effect of that agreement.

In reviewing the agreement, the district court used a very strict criterion articulated as simply, "No clear expression, no indemnity." Hatco, 801 F. Supp. at 1321. In other words, the district court opined that matters extrinsic to the agreement are irrelevant to the indemnity inquiry. However, when a writing is ambiguous, New York cases require the admission of extrinsic evidence to establish or disprove the intent of the parties.

The assumption agreement that Hatco executed specifically incorporated the sale agreement and read in pertinent part:

> "1. [Hatco] hereby assumes and agrees to pay and discharge in due course all liabilities of [Grace] attributable to the Chemical Business listed in Exhibit A to this instrument, and [Hatco] hereby assumes and agrees to perform and fulfill all obligations of [Grace] attributable to the Chemical Business . . . .
>
> 2. [Hatco also] agrees to indemnify [Grace] and to save and hold [Grace] harmless from and against any and all damage, liability, [or] loss . . . arising out of or

resulting from any failure by [Hatco] duly to perform or fulfill any agreement set forth in this instrument."

Liabilities and obligations of Grace attributable to the chemical business and assumed by Hatco were defined in relevant part as follows:

"(b)  [Hatco assumes] the following obligations and liabilities existing on the date of the Closing, or in the case of those described in clause (iv), arising thereafter . . . :

(i)  obligations with respect to sales orders accepted by the Chemical Business, other than Excluded Liabilities;

(ii)  obligations for goods and services ordered by the Chemical Business, other than Excluded Liabilities;

(iii)  liabilities and obligations with respect to capital expenditures described in any Request for Capital Appropriation approved in accordance with [Grace's] customary procedures by the management of the Chemical Business, or any management group of [Grace] senior thereto;

(iv)  other obligations and liabilities arising in the ordinary course of the Chemical Business, whether prior to or after the date of the Closing, other than Excluded Liabilities;

(v)  other liabilities and obligations of which Alex Kaufman or David G. Seabrook[5] has actual present personal knowledge and awareness at the date of the Sale Agreement, other than Excluded Liabilities;

---

5.  Seabrook served as a financial analyst at the Fords plant at one time and as one of the principal negotiators for Hatco in its purchase of the facility in 1978.

(vi)  other liabilities and obligations
which do not exceed $5,000 per item and
$50,000 in the aggregate, other than Excluded
Liabilities."  (emphasis added).

The "Excluded Liabilities" that Hatco did not assume
were listed in specific detail and fell into a number of
categories, including two pending law suits, a potential personal
injury claim, and the "[a]lleged pollution of Sling Tail Brook on
or about May 31, 1977."

"Chemical business" was defined as "that business
presently conducted by [Grace] comprising the manufacture and
sale of plasticisers and synthetic lubricants . . . at Fords, New
Jersey."  The sale agreement tracked the language and
specifications set out in the assumption agreement.

A.

Grace contends that the pollution at the Fords site is
included within the phrase "other obligations and liabilities
arising in the ordinary course of the Chemical Business" and thus
is within the scope of clause (iv).  The district court rejected
that argument and relied on Haynes v. Kleinewefers & Lembo Corp.,
921 F.2d 453 (2d Cir. 1990) for support.  In that case, the Court
of Appeals for the Second Circuit found that contractual
provisions -- identical in some respects to those of the case at
hand but in an indemnity setting -- were unambiguous.  In Haynes,
the purchaser of a business sought to recover amounts it had paid
to settle the personal injury claim of its employee who was
injured by a defective machine previously owned by the seller.

The Court held that the purchaser was entitled to indemnity because the injury did not occur "in the ordinary course of business," a factor that the contractual language required as a prerequisite to absolving the seller.

The Haynes court, relying on the general rule of construction, ejusdem generis, concluded that "[f]ollowing an enumeration of particular classes `other' must be read as `other such like,' and includes only others of like kind and character." Id. at 457 (quoting Black's Law Dictionary 992 (5th ed. 1979)). The court thus construed the phrase "other obligations and liabilities arising in the ordinary course of business" as including matters similar to those previously enumerated in the same paragraph -- such as orders for sales that had been accepted by the seller, orders for goods or services, and capital expenditures. Id. at 458. Because those categories were quite dissimilar to an incident resulting in personal injury, the court held that the employee's claim was not included among the obligations that the buyer had undertaken. The language of the agreement "fail[ed] to establish clearly an unmistakable intent to assume an obligation to indemnify." Id.

Even assuming that personal injury to an employee does not arise in the ordinary course of business, we nevertheless differ with the district court's view that Haynes governs the case at hand. There are two crucial factors that set the present dispute apart from that in Haynes. First, disposal of waste in the operation of a chemical plant is very much a function of the day-to-day operation of the business. Second, unlike the lack of

a relevant intimation of personal injury claims in the Haynes agreement, in the one at hand, there is a specific and important reference to at least one environmental claim -- the Sling Tail Brook pollution incident.

If one substitutes the phrase "Alleged pollution of Sling Tail Brook on or about May 31, 1977" for the term "Excluded Liabilities" in every instance where that term appears in paragraph (b), the facially appealing argument that clause (iv) relates only to "accepted sales orders, ordered goods and services, and capital expenditures" falls apart. We conclude that the phrase "ordinary course of the Chemical Business," together with the reference to an environmental claim in the excluded liabilities section, creates an ambiguity as to the scope of the assumption agreement. Consequently, extrinsic evidence must be admitted to properly discern the intent of the parties.

To bolster its argument, Grace sought to show that during the negotiations for sale, Hatco attempted to include in the agreement express language excluding environmental liability, but that Grace refused to do so. Although the district court held that extrinsic evidence was not permissible, it nevertheless did review Grace's contention and reasoned that it "improperly [sought] to reverse the burden of expression of intent." Hatco, 801 F. Supp. at 1321. The court concluded that the burden of manifesting a clear expression of intent must fall on Grace. Id. However, as we have set out in our discussion of New York law, the burden of demonstrating the intent of the parties falls on

Hatco because it is the releasor attempting to limit the effect of the release.

B.

The district court also reviewed Hatco's contention that the agreement's definition of "Chemical Business," in referring to "business presently conducted," would not include claims arising from manufacturing operations that had been discontinued some time before the sale. The court remarked that although it agreed with Hatco's position on the point, "Grace's arguments at best lead to the conclusion that the meaning of `Chemical Business' is ambiguous . . . ." Id. We agree that an ambiguity exists, and on this point also, extrinsic evidence should have been admitted.

C.

Clause (v) provides that Hatco would assume "other liabilities and obligations of which Alex Kaufman or David G. Seabrook has actual present personal knowledge and awareness at the date of the Sale Agreement." The extent of those individuals' actual knowledge is disputed, but there seems to be little doubt that they were both aware of actual or potential environmental problems in 1978. As noted earlier, Hatco unsuccessfully sought to insert in the agreement specific disclaimers of liability for such risks.

The district court concluded that CERCLA liabilities did not exist at the time of the sale and, therefore, clause (v) did not establish that Hatco had assumed them. As the court viewed the situation, "liability" necessarily indicated "a legal

relationship between the liable party and the party to whom it is liable." Id. at 1322. According to the court, "No such legal relationship existed . . . until [the] enactment of CERCLA." Id. Thus, the existence of facts necessary for CERCLA liability in the court's view was not "sufficient to constitute knowledge of `liabilities.'" Id.

This reasoning is not consistent with the court's earlier pronouncement that a broad assumption of environmental liability pre-dating CERCLA would be effective for post-CERCLA claims. Id. at 1317-18. That conclusion was clearly correct. See Fisher, 37 F.3d at 110-11 n.1; Beazer, 34 F.3d at 211; Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 309-10 (3d Cir. 1985).[6] In those cases, as well as in the one here,

_____

[6]. See also Joslyn Mfg. Co. v. Koppers Co., 40 F.3d 750, 754-55 (5th Cir. 1994) (two leases dated 1942 and 1949 were sufficiently broad so as to transfer responsibility for cleanup costs, "even though environmental liability . . . was not specifically contemplated at the time of contracting") (applying Louisiana law); Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326-27 (7th Cir. 1994) (1972 agreement was sufficiently broad so as to transfer responsibility for cleanup costs, agreement covered claims of "pollution or nuisance," and state environmental statute was enacted two years before the parties contracted) (applying Illinois law); Olin, 5 F.3d at 15-16 (1974 agreement was sufficiently broad so as to transfer responsibility for cleanup costs "even to future unknown liabilities") (applying New York law); John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 407 (1st Cir. 1993) (1959 agreement was narrow so as to preclude transfer of responsibility for cleanup costs because agreement only related to "existing" liabilities, but apparently made no mention of environmental liabilities) (applying Massachusetts law); United States v. Hardage, 985 F.2d 1427, 1435 (10th Cir. 1993) (1972 and 1977 agreements to transport hazardous waste were sufficiently broad so as to transfer responsibility for cleanup costs, and yet sufficiently narrow so as to preclude cross-indemnification) (applying Oklahoma law); AM Int'l, Inc. v. International Forging Equip. Corp., 982 F.2d 989, 997 (6th Cir. 1993) (1979 agreement, but remand was necessary to determine

"[n]o such legal relationship existed . . . until [the] enactment of CERCLA," but despite that chronology, pre-CERCLA agreements were held effective.

The district court also commented that "Grace seems to forget that the CERCLA liabilities in issue were _its_ liabilities to begin with." _Hatco_, 801 F. Supp. at 1321. Although these environmental liabilities were obviously attributable to Grace before the sale in 1978, we find the court's statement to be irreconcilable with its later conclusion that these identical liabilities were not "existing" on the closing date. See _id_. at 1322. Indeed, the first step in determining whether Hatco assumed Grace's liabilities is whether Grace had any liabilities to be assumed.

The court similarly remarked that "[w]ithout a statutory or common law basis to impose responsibility, . . . it is too far of a stretch to characterize the existence of the facts as a `liability.'" _Id_. But Grace had already incurred potential environmental liabilities under state and federal law before the closing date of the 1978 assumption agreement.[7] Grace

(..continued)
whether parties contemplated environmental liabilities despite the fact that the agreement apparently made no mention of environmental liabilities) (applying Ohio law); _Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc._, 624 N.E.2d 959, 966 (Mass. 1993) (1976 agreement was sufficiently broad so as to transfer responsibility for cleanup costs, and "the parties were aware of changing [environmental] regulations and strict liability was a tenable claim") (applying New Jersey law).

[7]. The parties both limit their discussion of environmental liabilities to those arising under New Jersey as well as federal law.

was responsible under state common-law and statutory provisions for the abatement of the environmental harm to the Fords site resulting from past hazardous waste disposal practices. In State, Dep't of Envtl. Protection v. Ventron Corp., 468 A.2d 150, 163 (N.J. 1983), the Supreme Court of New Jersey pointed out that "the Spill Act [did] not so much change substantive liability as it establishe[d] new remedies for activities recognized as tortious both under prior statutes and the common law." See also Leo v. Kerr-McGee Chem. Corp., 37 F.3d 96, 101 & n.8 (3d Cir. 1994) (citing T & E Indus., Inc. v. Safety Light Corp., 587 A.2d 1249 (N.J. 1991)); Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc., 624 N.E.2d 959, 965-67 (Mass. 1993) (applying New Jersey law). Because the waste disposal practices at the Fords site threatened the public health and the environment by leaching chemicals into potential sources of drinking water, corresponding responsibility for cleanup existed on the date of closing under federal theories as well. See, e.g., United States v. Price, 688 F.2d 204, 214 (3d Cir. 1982); United States v. Solvents Recovery Serv. of New England, 496 F. Supp. 1127 (D. Conn. 1980).

The Mardan court's view of New York law is also pertinent: "[I]f the injury is known, and the mistake [of the parties] is merely as to the consequence, future course, or sequelae of a known injury, then the release will stand." Mardan, 804 F.2d at 1463 (internal quotation omitted) (applying New York law); see also Purolator Prods. Corp. v. Allied-Signal, Inc., 772 F. Supp. 124, 137 (W.D.N.Y. 1991) (applying New York law). In the circumstances here, it is of no practical

importance whether Grace's obligation to clean up the site would be imposed by CERCLA, another federal statute, the common law, or a New Jersey statute. In any event, the process would require the expenditure of substantial sums of money, and it is that reimbursement which Hatco seeks here. We, therefore, do not accept the district court's restrictive view of the term "liabilities" as found in paragraph (b) of Exhibit A to the assumption agreement.

The circumstances of the sale from Grace to Hatco are unique in that Kaufman, the owner of Hatco, had been in charge of Grace's activities at the Fords facility for many years before the transfer of ownership. It may be an exaggeration, but it makes the point to say that the buyer knew more about the plant and its operations than did the seller.

Kaufman's knowledge as of the closing date was discussed at length by the district court in its findings of fact after the trial. The court found that Kaufman had been highly regarded by Grace as an organic chemist. Hatco v. W.R. Grace & Co.--Conn., 836 F. Supp. 1049, 1077 (D.N.J. 1993). He had been employed by Grace's predecessor in a number of capacities and, at one point, had been in the research and development laboratory that was responsible for product developments and improvements in the manufacturing processes. He became plant manager and acquired familiarity with waste disposal practices at the facility. In 1960, at his request, an engineering expert submitted a report on the waste water disposal practices at Fords.

In 1962, Kaufman became president of the division that operated the facility and began to spend more of his time acquiring new business, rather than taking a particularly active part in running the day-to-day operation of the Fords plant. Id. at 1078. However, he was regularly informed of any contacts with governmental agencies on environmental matters, other environmental problems at the facility, and the plant's pollution control expenditures. Id. at 1079. He received monthly reports on whether the Grace chemical division had been involved in any government proceedings pertaining to enforcement of environmental laws.

As of 1978 at the latest, Kaufman was aware of the increasing activity of governmental agencies in coping with the environmental consequences of past and present chemical manufacturing activities. He was kept advised of impending legislation, including such federal statutes as the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2629, and understood that those involved in the chemical business had to be concerned about environmental regulations.

These findings offer compelling reasons for determining the extent of Kaufman's knowledge at the time of the closing. Seabrook also had worked for some time at the plant before its sale to Hatco, and his knowledge, too, is a crucial issue. Without further proceedings to adequately develop those facts, the court will be unable to decide the meaning of clause (v).

D.

To resolve the ambiguities that we have discussed, it will be necessary that the matter be remanded to the district court so that it may conduct a hearing at which extrinsic evidence may be produced in order to determine the full scope and effect of the assumption agreement. However, before concluding, we must determine whether this case must be tried to a jury.

## III.

Grace contends that it was entitled to a jury trial on its CERCLA claims. The procedural aspects of the jury trial issue in this record are somewhat blurred. Rather than exploring the complexities, we shall assume that Grace was entitled to rely on the jury trial demand originally made by Hatco on the CERCLA claims.[8] The district court denied Grace's requests, concluding that cost-recovery actions and claims for contribution under CERCLA, 42 U.S.C. §§ 9607(a)(4) and 9613, are equitable in nature. Hatco v. W.R. Grace & Co.--Conn., 859 F. Supp. 769, 774 (D.N.J. 1994). The district court ruled that cost-recovery suits are actions for restitution and are not triable to a jury.

42 U.S.C. § 9607(a)(1)(B) provides that the owner or operator of a facility is liable for "necessary costs of response incurred by any other person consistent with the national

---

[8]. It is questionable whether Grace's demand for a jury trial on its "counterclaim" was appropriate. The assumption agreement is properly characterized as a release that should have been pleaded as an affirmative defense. It is not a separate claim. See Owens-Illinois, Inc. v. Lake Shore Land Co., 610 F.2d 1185 (3d Cir. 1979). See also Fed. R. Civ. P. 8(c) (a defense improperly pleaded as a counterclaim may be treated by the court "as if there had been a proper designation").

contingency plan."  Judicial construction of this section originally created an implied right of contribution.  See Key Tronic Corp. v. United States, 114 S. Ct. 1960, 1965 (1994).  However, a subsequent amendment to CERCLA (SARA), 42 U.S.C. § 9613(f)(1) provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . during or following any civil action under [that section]."  The court is permitted to allocate response costs under section 9613(f)(1) "using such equitable factors as the court determines are appropriate."  As the Supreme Court said, sections 9607 and 9613 provide "similar and somewhat overlapping remed[ies]."  Key Tronic, 114 S. Ct. at 1966.

In United States v. Alcan Aluminum Corp., 964 F.2d 252 (3d Cir. 1992), we determined that under section 9607, an alleged responsible party is entitled to prove that the environmental harm is divisible and thus is reflected in the degree of liability.  On the other hand, section 9613(f)(1) allows more discretion to the court in allocating response costs, and factors other than liability may enter into apportionment.  Id. at 270 n.29; see also United States v. Colorado & E. R.R., 50 F.3d 1530, 1534-38 (10th Cir. 1995) (§ 9607 establishes joint and several responsibility on a strict liability basis; § 9613 allocates amounts due on equitable considerations).  Both sections are intertwined, and there are practical difficulties with making a distinction between them that would justify differing rulings on the availability of a jury trial.

As a general rule, the right to a jury trial is protected by the Seventh Amendment when the claim is a legal one, but not if it is equitable.  In establishing new statutory remedies, Congress may provide for jury trials in addition to those required by the Constitution.  Tull v. United States, 481 U.S. 412, 417 n.3 (1987); Curtis v. Loether, 415 U.S. 189, 191–92 (1974).  The determination of which form of trial is applicable to a specific claim, however, is not always a simple one, particularly when the remedy is statutory and Congress has not stated its intention.  See the discussion in Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 744–49 (D.C. Cir. 1995).

A.

The only appellate court ruling on the right to a jury trial in CERCLA cases is United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726 (8th Cir. 1987).  There, the Court of Appeals determined that a jury trial was not permitted in an action brought under section 9607 by the government against several individuals, alleging them to be jointly and severally liable for response costs.  Id. at 749. The Court observed that the government was asking for restitution of amounts that it had expended and as such was seeking a form of equitable relief.

Restitution is based on substantive liability having its origins in unjust enrichment or the restoration to a party in kind of his lost property or its proceeds.  Crocker, 49 F.3d at 747; see also Porter v. Warner Holding Co., 328 U.S. 395, 402 (1946) (restitution is within the traditional equitable powers of

the court); Restatement of Restitution § 115.  Northeastern
Pharmaceutical's holding has been widely accepted, and Grace does
not take issue with it on this appeal.  We are in agreement that
a jury trial is not available in a claim brought under section
9607.

B.

Whether a right to a jury trial exists in a claim
grounded in section 9613(f)(1) has not been decided by any
appellate court, but the district courts have reached conflicting
results on the issue.[9]  The statute contains no references to the
right to juries.  One district court, after performing an
exhaustive search, found no specific comments in the legislative
history.  See American Cyanamid Co. v. King Indus., Inc., 814 F.
Supp. 209, 212-13 (D.R.I. 1993).

We note that one statement in the Report of the House
Committee on the Judiciary accompanying SARA tends to disclaim
any congressional intent to have juries decide § 9613 matters.

"New subsection [9613(f)(1)] of CERCLA

. . . ratifies current judicial decisions

that the courts may use their equitable

powers to apportion the costs of clean-up

among the various responsible parties

involved with the site.  Courts are to

_____

[9].  Compare American Cyanamid Co. v. King Indus., Inc., 814 F.
Supp. 209, 213-15 (D.R.I. 1993); Wehner v. Syntex Corp., 682 F.
Supp. 39, 39-40 (N.D. Cal. 1987) with United States v. Shaner,
No. 85-1372, 1992 WL 154618, at **2-4 (E.D. Pa. June 15, 1992)
(unpublished opinion).

resolve claims for apportionment on a case-by-case basis pursuant to Federal common law, taking relevant equitable considerations into account. Thus, after questions of liability and remedy have been resolved, courts may consider any criteria relevant to determining whether there should be an apportionment."

131 Cong. Rec. 34,645 (1985); see also H.R. 253(III), 99th Cong., 2d Sess. 19 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 3038, 3041-42.

Finding no clear indication of congressional intent to grant a jury trial in either the statute or the legislative history, we must therefore look to the constitutional guarantee in the Seventh Amendment. The Supreme Court has supplied the formula for this largely historical review, acknowledging its difficulty. "`First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.'" Wooddell v. International Bhd. of Electrical Workers, Local 71, 502 U.S. 93, 97 (1991) (quoting Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry, 494 U.S. 558, 565 (1990)).

In In re Japanese Elec. Prods. Antitrust Litig., 631 F.2d 1069 (3d Cir. 1980), we were favored with an elaborate historical presentation by the parties. After considering the various arguments, we concluded that courts determine "the legal

or equitable nature of a suit by comparing it with suits actually tried in courts of common law or equity."  Id. at 1083.

The parties here have not briefed the historical phase of the inquiry, and we disclaim an exhaustive survey of our own on whether contribution in the 18th century was an equitable or legal remedy.  Our research, however, indicates that during the relevant period, contribution was an equitable remedy.  In reviewing various texts, we have found Joseph Story's Commentaries on Equity Jurisprudence (2d ed. 1839) to be the most persuasive.  Conceding that, in a few cases, a common-law remedy of contribution existed, the author states that the

> "more beneficial exercise of Equity
> Jurisdiction, in cases of apportionment and
> contribution, is in cases, where . . .
> charges on real estate . . . are actually
> paid off by some of the parties in interest.
> . . .  In most cases of this sort there is no
> remedy at law, from the extreme uncertainty
> of ascertaining the relative proportions,
> which different persons, having interests of
> a very different nature, quality, and
> duration, in the subject-matter, ought to
> pay."

Id. § 483, at 461 (footnote omitted).  That comment is particularly applicable in CERCLA claims.

Justice Story also referred to opinions written by the highly regarded authority on equity, Chancellor Kent of New York.

Id. § 469, at 449 n.2.  In Cheesebrough v. Millard, 1 Johns. Ch. 409, 415 (N.Y. Ch. 1815), Kent wrote that "[t]he object of the principle of contribution is equality in the support of a common burden . . . ."  Similarly, in Campbell v. Mesier & Dunstan, 4 Johns. Ch. 334, 338 (N.Y. Ch. 1820), he observed that "[t]he doctrine of contribution is founded, not on contract, but on the principle, that equality of burden, as to a common right, is equity . . . ."

Chancellor Kent cited Lord Chief Baron Eyre's opinion in Dering v. Earl of Winchelsea, 1 Cox's Ch. Cas. 318, 321, 29 Eng. Rep. 1184, 1185, 2 Bos. & Pull. 270 (Ex. 1787), where it is said, "we shall find that contribution is bottomed and fixed on general principles of justice, and does not spring from contract . . . . [T]he doctrine of equality operates more effectually in this Court, than in a Court of law."  See also Stevens v. Cooper, 1 Johns. Ch. 425, 430 (N.Y. Ch. 1815) ("It is a doctrine well established, that when land is charged with a burden, the charge ought to be equal, and one part ought not to bear more than its due proportion; and equity will preserve this equality by compelling the owner of each part to a just contribution.") (citing Harbert's Case, 3 Coke's Rep. 14, 76 Eng. Rep. 647 (Ex. 1584); Harris v. Ingledew, 3 P. Wms. 91, 24 Eng. Rep. 981 (M.R. 1730)); John Adams, The Doctrine of Equity 219-25 (1st ed. 1850).[10]

---

[10].  As the Supreme Court noted in Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO, 451 U.S. 77, 86 n.16 (1981), the non-contribution rule of the common law is generally traced to Merryweather v. Nixan, 8 Term. Rep. 186, 101 Eng. Rep.

Although John N. Pomeroy's Treatise on Equity
Jurisprudence § 1418, at 468 n.1 (1st ed. 1883) states that
"jurisdiction at law has become well settled which is sufficient
in all ordinary cases of suretyship or joint liability," he
acknowledges that "[t]he equitable jurisdiction still remains and
has some most important advantages."  That commentary, however,
was written several decades after that of Justice Story.  As
George E. Palmer explains in his work The Law of Restitution
§ 1.5, at 31 (1978), enforcement of contribution claims by suits
at law did not appear until early in the nineteenth century.

        The nature of CERCLA claims has been noted by us in
passing, "The contribution proceeding is an equitable one in
which a court is permitted to allocate response costs based on
factors it deems appropriate."  Alcan, 964 F.2d at 270 n.29.  In
another context we remarked, "[T]he right of contribution from
others is grounded in equity."  Pacific Indem. Co. v. Linn, 766
F.2d 754, 769 (3d Cir. 1985).

        After our review of the more important authorities, we
are of the belief that a claim for contribution of the nature
presented in the case before us would have been entertained by a
chancellor in equity in 1791, but not by a court at law.  That
determination is not dispositive in and of itself because the
claims here are brought pursuant to the terms of a statute.  As

(..continued)
1337 (K.B. 1799).  Because most American courts understood that
case as a general proscription of contribution, the early common
law in this country prohibited contribution among joint
tortfeasors.

the Supreme Court has observed, where Congress provides for enforcement of statutory rights in a civil suit, "a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law." Curtis, 415 U.S. at 195. But certainly the fact that the remedy was one typically granted only in equity argues against a statutory remedy being considered as one at law.[11]

In Rex v. CIA. Pervana de Vapores, S.A., 660 F.2d 61, 65 (3d Cir. 1981), we observed that the Seventh Amendment issue presented in a case must be considered in the context of the congressional schema in which it arises. As noted earlier, CERCLA's language and legislative history lack any evidence of intent to have the claims determined by a jury. To the contrary, references to equity and equitable factors do appear, and we may assume that Congress was well aware that juries are not a feature of equitable trials. It is entirely reasonable, therefore, to believe that Congress intended to design a remedy that would track traditional equity practice. Cf. Cox v. Keystone Carbon Co., 861 F.2d 390, 393 (3d Cir. 1988) (ERISA case) ("[W]e can infer that Congress knew the significance of the term equitable and intended that no jury be available on demand."); see also

---

[11]. Lord Devlin argues that the test should be whether a chancellor in 1791 would have exercised the power of equity to hear the case, not the more narrow inquiry of whether precedent demonstrated that such suits had actually been heard. See Patrick Devlin, Equity, Due Process and the Seventh Amendment: A Commentary on the Zenith Case, 81 Mich. L. Rev. 1571 (1983). It would seem that Lord Devlin's approach, unfortunately, would lead to even more uncertainty in determining the bounds of the Seventh Amendment.

Pane v. RCA Corp., 868 F.2d 631, 637 (3d Cir. 1989) (ERISA case).

In the case at hand, the district court reasoned that because the precipitating claims under section 9607 are primarily equitable in nature, a claim for contribution under section 9613(f)(1) is also essentially equitable. Hatco, 859 F. Supp. at 775. The court further relied on the fact that section 9613(f)(1) requires a court to apportion the costs between the parties "using such equitable factors as the court determines are appropriate." Id. at 775 n.3.

We concur with the district court's reasoning. Particularly, we are impressed with the references in section 9613(f)(1) to "equitable" factors. This is an indication that the statutory action for contribution is to be a flexible remedy that may be based on circumstances not cognizable in nor readily adaptable to an action at law. In sum, we are persuaded that an action for contribution under section 9613(f)(1) is essentially equitable. Accord United States v. R.W. Meyer, Inc., 932 F.2d 568, 572 (6th Cir. 1991). Accordingly, we hold that in suits brought under 42 U.S.C. §§ 9607 or 9613(f)(1), the parties are not entitled to a jury trial.

IV.

The parties have raised a number of other issues not related to the 1978 assumption agreement. We decline to address them at this juncture because the ultimate resolution of the assumption question could be outcome-determinative and our opinion on those other issues would be merely advisory. Accordingly, we will vacate the judgment of the district court

and will remand for further proceedings consistent with this opinion.

        Each party to bear its own costs.

TO THE CLERK:

        Please file the foregoing Opinion.


                       _____
                            Circuit Judge

ADDENDUM

The assumption agreement between Grace and Hatco read

as follows:


"HATCO CHEMICAL
BUYER'S ASSUMPTION AGREEMENT

. . . [P]ursuant to the Sale Agreement and
for valuable consideration, the receipt of
which is hereby acknowledged,
    1.  [Hatco] hereby assumes and agrees to
pay and discharge in due course all
liabilities of [Grace] attributable to the
Chemical Business listed in Exhibit A to this
instrument, and [Hatco] hereby assumes and
agrees to perform and fulfill all obligations
of [Grace] attributable to the Chemical
Business listed in Exhibit A to this
instrument.  As used in this instrument,
"Chemical Business" means that business
presently conducted by the Chemical Division
of the Hatco Group of [Grace] comprising the
manufacture and sale of plasticisers and
synthetic lubricants at a principal
manufacturing location at Fords, New Jersey.
For purposes of this instrument, "Chemical
Business" does not include the business of
purchase and resale of oxo-alcohols conducted
by such Chemical Division, or any interest of
[Grace] in Grace Petro-chemicals, Inc. or its
undivided one-half interest in Oxochem
Enterprise.
    2.  [Hatco] hereby agrees to indemnify
[Grace] and to save and hold [Grace] harmless
from and against any and all damage,
liability, loss, cost or deficiency
(including, but not limited to, reasonable
attorneys' fees and other costs and expenses
incident to proceedings or investigations of
the defense of any claim) arising out of or
resulting from any failure by [Hatco] duly to
perform or fullfill any agreement set forth
in this instrument."

Exhibit A of the assumption agreement provided the following:

"Assumed Liabilities and Obligations [By Hatco]

The following liabilities and obligations of [Grace] attributable to the Chemical Business:

(a)  liabilities of the Hatco Chemical Division of [Grace] reflected in, reserved against or noted on the Closing Net Statement, other than Excluded Liabilities; and

(b)  the following obligations and liabilities existing on the date of the Closing, or in the case of those described in clause (iv), arising thereafter, whether or not they are reflected in, reserved against or noted on the Closing Net Statement:

(i)  obligations with respect to sales orders accepted by the Chemical Business, other than Excluded Liabilities;

(ii)  obligations for goods and services ordered by the Chemical Business, other than Excluded Liabilities;

(iii)  liabilities and obligations with respect to capital expenditures described in any Request for Capital Appropriation approved in accordance with [Grace's] customary procedures by the management of the Chemical Business, or any management group of [Grace] senior thereto;

(iv)  other obligations and liabilities arising in the ordinary course of the Chemical Business, whether prior to or after the date of the Closing, other than Excluded Liabilities;

(v)  other liabilities and obligations of which Alex Kaufman or David G. Seabrook has actual present personal knowledge and awareness at the date of the Sale Agreement, other than Excluded Liabilities;

(vi)  other liabilities and obligations which do not exceed $5,000 per item and $50,000 in the aggregate, other than Excluded Liabilities.

All terms defined in the Sale Agreement have the same meaning in this agreement.  The following are the Excluded Liabilities, as defined in the Sale Agreement:

`Excluded Liabilities' means the following liabilities and obligations of [Grace] attributable to the Chemical Business for all periods ending on or prior to the date of the Closing:  (a) all liabilities for taxes, including without limitation income taxes, (except federal, state and local payroll and withholding taxes for the pay period which includes the date of the Closing, to the extent not paid by [Grace], provided an accrual in such amount shall be made in the Closing Net Amount) (b) notes and accounts payable to other groups, divisions or other units or subsidiaries or affiliates of [Grace], other than trade accounts payable arising from the purchase of goods, (c) liabilities against which [Grace] is effectively insured, without regard to any applicable deductible amounts, (d) product liabilities, including without limitation liabilities for personal injury, with respect to merchandise sold or shipped prior to the date of the Closing, (e) liabilities and obligations arising from claims asserted by any employee or former employee with respect to injury, sickness, disease or death or under any disability of workmen's compensation laws, (f) liabilities for which the corresponding assets are prepaid expenses and deferred charges, the benefit of which cannot be effectively transferred to [Hatco], (g) liabilities and obligations arising from claims asserted by any of the former owners or managers of any predecessor company, any portion of the business or assets of which is included in the Chemical Business or the Chemical Assets, and (h) the liabilities specifically described in the schedule to this Exhibit."

The schedule to Exhibit A of the assumption agreement provided the following:

"Excluded Liabilities [i.e., Those Retained By Grace]

1.  Alleged pollution of Sling Tail Brook on or about May 31, 1977.
2.  Canton v. Buffalo Tank, et al., Superior Court of New Jersey, Middlessex County, Docket L-4354-77.
3.  Potential claim by Norman Bresee for personal injury incurred at the Chemical plant in 1976.
4.  Liloia v. E.I. duPont de Nemours & Co., Inc., et al., Superior Court of New Jersey, Essex County, Docket L-44267-76."

Hatco Corp. v. W.R. Grace & Co.--Conn.
No. 94-5276


HUTCHINSON, J., <u>Concurring and Dissenting</u>.


I concur in the decision to vacate the district court's judgment in favor of Hatco on its claim for contribution from Grace. I agree that the district court incorrectly applied federal rather than New York law to interpret the meaning of the ambiguous provisions in the sales agreement governing Hatco's responsibility for liabilities arising out of Grace's prior operation of its "chemical business" on the real property Hatco purchased. <u>See</u> <u>Beazer East, Inc. v. Mead Corp.</u>, 34 F.3d 206 (3d Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 1696 (1995). I respectfully disagree, however, with the Court's conclusion that New York law requires the applicable provisions of the sales agreement to be construed as a release rather than a promise to indemnify. I believe that these provisions are also ambiguous as to whether the parties intended to release or indemnify Grace against such liabilities. Indeed, Hatco's release is Grace's indemnity. Thus, I believe their characterization as a release or an indemnity is a question of fact that should be decided by the district court in the first instance.

New York law is not a model of clarity in distinguishing releases from agreements to indemnify. <u>Compare</u> <u>Structural Painting Corp. v. Travelers Indem. Co.</u>, 451 N.Y.S.2d 875, 876 (N.Y. App. Div. 1982) <u>with</u> <u>Walsh v. Morse Diesel, Inc.</u>, 533 N.Y.S.2d 80, 83 (N.Y. App. Div. 1988). In New York, as

elsewhere, a polluter seeking indemnity against the cost of abating its pollution must establish an unmistakable intent to indemnify as well as the extent of the indemnification by clear evidence. Heinbach v. Metropolitan Transp. Auth., 553 N.E.2d 242, 246 (N.Y. 1990) (citations omitted). New York law, on the other hand, allows a releasee to establish intent to release by a mere "expression of a present intention to renounce a claim." Carpenter v. Machold, 447 N.Y.S.2d 46, 47 (N.Y. App. Div. 1982) (citation omitted). Moreover, once a document construed as a release is held to be ambiguous, the burden of proving the kinds of harm that are not subject to the release shifts to the releasor. Structural Painting, 451 N.Y.S.2d at 876.

Unfortunately, the uncertainty that arises in applying these distinctions to disputes among two or more polluters of a single site over payment of the cost of abating contamination each has contributed to seems to me likely to increase the already staggering transactional costs of CERCLA litigation. I am especially reluctant to hold, as a matter of law, that New York would construe an agreement like the one before us as a release if, as the Court indicates, it introduces the factor of who acts first into the process of distinguishing agreements of release from promises to indemnify. See Majority Op. at 11. This could import into CERCLA litigation an incentive for a polluter to delay the start of clean up lest this publicly responsible act may prove privately costly. Thus, I believe CERCLA's goal of expeditious environmental cleanup will be better served by interpreting provisions in ambiguous agreements for

allocation of the cost of abating pollution among polluters as agreements of indemnity rather than agreements of release, when applicable local law makes that possible.

Accordingly, though I concur in the Court's mandate remanding this case to the district court for reconsideration of Hatco's claim for contribution under New York rather than federal common law, I would also leave the district court free to decide, in the first instance, whether the parties intended an agreement of release or one of indemnity.[12]

---

[12]. I agree with the Court that additional evidence may be needed on remand concerning Kaufman's and Seabrook's knowledge of the extent to which the site was polluted before the sale. In addition, I note my full agreement with the scholarly analysis the Court adduces to support its rejection of Grace's contention that it has a Seventh Amendment constitutional right to a jury trial on its CERCLA claims.