**CITY OF TOLEDO, Plaintiff,**

v.

**BEAZER MATERIALS AND SERVICES, INC., Successor-in-Interest to Koppers Company, Inc.; Toledo Coke Corporation; the Interlake Corporation, Successor-in-Interest to Interlake, Inc.; the Interlake Companies, Inc., Successor-in-Interest to Interlake, Inc. and Acme Steel Company, Successor-in-Interest to Interlake, Inc., Defendants.**

No. 90–CV–7344.

United States District Court,
N.D. Ohio,
Western Division.

Nov. 20, 1995.

**1053**

John D. Scouten, City of Toledo, Department of Law, Toledo, OH, D. David Altman, Stephen P. Calardo, Altman & Calardo, Cincinnati, OH, for Plaintiff City of Toledo.

Joseph A. Gregg, Eastman & Smith, Toledo, OH, Chester R. Babst, III, Kenneth R. Bruce, Mindy J. Shreve, Steven Baicker–McKee, Babst, Calland, Clements & Zomnir, for Defendant Beazer East, Inc.

Toledo Coke Corporation, J.D. Crane, President, Toledo, OH, for Defendant Toledo Coke Corporation.

Paul W. Schroeder, Suzanne S. Greene, Katherine Delahunt, Jones, Day, Reavis &

Pogue, Chicago, IL, Janet L. Miller, Jones, Day, Reavis & Pogue, Cleveland, OH, for Defendants the Interlake Corporation & Acme Steel Company.

*BEAZER AND INTERLAKE'S CROSS MOTIONS FOR SUMMARY JUDGMENT MEMORANDUM AND ORDER*

WILLIAM K. THOMAS, Senior District Judge.

Cross-motions for Summary Judgment of Beazer and Interlake are ready for disposition.

On January 3, 1995 cross-defendant Beazer East, Inc., formerly known as Beazer Material Services, Inc. and, before that, Koppers Company, Inc. ("Beazer") moved for Partial Summary Judgment against Cross–Plaintiffs, The Interlake Corporation, The Interlake Companies, Inc., and Acme Steel Company (collectively "Interlake") as to Interlake's Count III (Breach of Contract) and IV (Declaratory Judgment Under Contract) of Interlake's Amended Cross–Claim and Counter–Claim. Beazer filed its supporting brief,[1] after receiving permission to exceed page limitation. It also filed an Appendix to its brief.

Interlake, on March 20, 1995, filed its Cross–Motion for Summary Judgment[2] on Counts III and IV of its Amended Cross–Claim and on "Counts I and IV of Koppers' Cross–Claims Against Interlake" seeking indemnification under the Purchase Agreement against the matters raised in the City's First Amended Complaint, and indemnification against "matters raised by the cross-claim by Toledo Coke against Beazer." On March 31, 1995 Interlake received court approval and filed its memorandum of law (exceeding page limitation) in support of its motion and in response to Beazer East Inc.'s Motion for

1. Beazer East, Inc.'s Brief in Support of Its Motion for Partial Summary Judgment (filed Jan. 3, 1995) is dubbed Beazer's First Brief; Beazer's Reply Brief in Support of its Motion for Partial Summary Judgment (filed June 6, 1995) is dubbed Beazer's Second Brief.

2. Interlake's Memorandum of Law In Support of Its Cross–Motion for Summary Judgment and in Response to Beazer East, Inc.'s Motion for Partial Summary Judgment (filed March 31, 1995) is dubbed Interlake's First Brief; Interlake's Reply Brief in Support of Its Cross–Motion for Summary Judgment (filed Sept. 20, 1995) is dubbed Interlake's Second Brief.

Partial Summary Judgment. Interlake also filed its "Statement of Undisputed Facts" and "Appendix."

Subsequently on June 6, 1995, Beazer filed its Response to Interlake's Statement of Undisputed Facts, its Opposition Brief to Interlake's Cross–Motion for Summary Judgment, and its Reply Brief in Support of its Motion for Partial Summary Judgment. Pursuant to its Motion to File Instanter, granted *nunc pro tunc* on October 13, 1995, Interlake, on September 20, 1995, filed its Reply in Support of its Cross–Motion for Summary Judgment.

### I.

The above cross-motions for summary judgment arise out of earlier pleadings of Beazer and Interlake. On June 21, 1993 Beazer filed cross-claims against the Interlake Corporation, The Interlake Companies, Inc., and Acme Steel (collectively, Interlake). Interlake's Cross–Motion for Summary Judgment is directed at Beazer's First and Fourth cross-claims. In pertinent part, the first cross-claim states:

1. Plaintiff [City of Toledo] brought this action against Beazer, Toledo Coke, The Interlake Corporation, The Interlake Companies, Inc. and Acme Steel Company, alleging causes of action under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607; Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(A) and (B); and state statutory and common law.

> Beazer's Answer, Countercl., and Cross-cl. at 22.

The first cross-claim of Beazer further alleges:

4. Upon information and belief, in 1986, Interlake, Inc. changed its name to Acme Steel Company. The Interlake Corporation and its wholly owned subsidiary, The Interlake Companies, Inc., assumed certain liabilities of Interlake, Inc. and/or agreed to indemnify Acme Steel Company for certain liabilities of Interlake, Inc., including those relating to the operation of the Toledo Coke Plant. References to "In-

terlake" hereafter shall include The Interlake Corporation, The Interlake Companies, Inc. and Acme Steel Company.

5. Upon information and belief, Interlake owned and operated the Toledo Coke Plant from 1905 through 1978.

6. By the terms of the Purchase Agreement, Koppers did not assume liabilities or obligations relating to default under any agreement, contract, commitment or understanding occurring prior to the sale and liabilities or obligations to pay any fine or penalty arising out of Interlake's operation of the Toledo Coke Plant prior to the date of the Agreement.

7. All debts, obligations, contracts and liabilities of Interlake not assigned to Koppers by Interlake and not assumed by Koppers in the Agreement remained the responsibility and liability of Interlake.

8. Liability for the matters alleged in the First Amended Complaint are liabilities and/or obligations which Koppers did not assume and for which Interlake specifically remains liable.

9. Pursuant to the Agreement Interlake is required to indemnify, defend and hold harmless Koppers from and against all actions, suits, proceedings, judgments, demands, costs and expenses of any kind or nature whatever (including all legal fees and expenses) which directly or indirectly relate to or arise out of liabilities not being assumed by Koppers pursuant to the Agreement.

10. Beazer made demand on Interlake to indemnify and hold Beazer harmless with respect to plaintiff's allegations and the relief sought by plaintiff. The demand was based upon Interlake's contractual obligation of indemnification contained in the Purchase Agreement.

11. Beazer denies that it is liable to the City and denies that the City has any meritorious claims against Beazer.

12. However, in the unlikely event that the City makes any recovery against Beazer by judgment, settlement or otherwise, Beazer asserts that it is entitled, pursuant to the Agreement, to indemnification from Interlake, including attorneys' fees and costs incurred by Beazer resulting from

the matters raised in the First Amended Complaint.

*Id.* at 23–24.

The fourth cross-claim of Beazer alleges:

20. The allegations in paragraphs 1 through 19 of defendant Beazer's cross-claims against Interlake are incorporated herein by reference.

21. By cross-claim, Toledo Coke seeks contribution and indemnification from Beazer, pursuant to the 1987 Agreement between Koppers and Toledo Coke, which Agreement (without exhibits) is attached hereto as Attachment A.

22. Beazer made demand on Interlake to indemnify Beazer for the matters raised in the demand by Toledo Coke.

23. Beazer denies that it is liable to Toledo Coke and denies that Toledo Coke has any meritorious claims against Beazer.

24. However, in the unlikely event that Toledo Coke makes any recovery against Beazer by judgment, settlement or otherwise, Beazer asserts that it is entitled, pursuant to the Agreement, attached hereto (without exhibit) as Attachment B, to indemnification by Interlake, including attorneys' fees and costs incurred by Beazer, for matters raised by the cross-claim by Toledo Coke against Beazer.

*Id.* at 26.

Four days later, on June 25, 1993, Interlake filed its Answer and Affirmative Defenses to the [City's] First Amended Complaint. Thereafter, in the same document, Interlake alleges its Amended Cross–Claim and Counter–Claim. In Count III (Breach of Contract–Beazer) of the Amended Cross–Claim, cross-plaintiffs and counter claimants (collectively Interlake) allege, in pertinent part:

20. On or about October 30, 1978, Interlake, Inc. and Koppers Company, Inc. ("Koppers") executed a purchase agreement in which the assets of the Plant were sold to Koppers by Interlake ("Agreement") . . .

21. The Plant's assets transferred to Koppers in the sale included the land of the Plant, together with all easements, buildings and structures, the machinery and equipment of the Plant, the Plant plans and drawings, all by-product inventories, all coal and coke in process and other items more specifically set forth in the Agreement.

22. As part of the Agreement, Koppers expressly promised to assume certain liabilities of Interlake. Section 3.1 of the Agreement provides in relevant part:

3.1 *Liabilities to be Assumed.* Upon the terms and subject to the conditions set forth herein, Seller shall assign to Buyer and Buyer shall assume at the Closing . . . all debts, obligations, duties, undertakings, agreements, contracts and liabilities of Seller of any kind or nature whatever, whether direct or indirect, absolute or contingent, which consist of, arise out of, or in any way relate to, any of the following (collectively, the "Toledo Coke Liabilities"):

. . . .

(c) Any law, statute, ordinance, order, rule, regulation, decree, application, permit, agreement (whether executory or partially performed) or commitment whether arising prior to, on or subsequent to the Closing and relating to . . .

(ii) the discharge at or by the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers or otherwise. . . .

23. Pursuant to the Agreement, Interlake and Koppers executed the Instrument of Assignment and Assumption Agreement ("Assumption Agreement") on [December 15, 1978]. . . . In the Assumption Agreement, Koppers confirmed its commitment to assume all of Interlake's Environmental Liabilities.

. . . .

25. In addition, Koppers agreed to indemnify, defend and hold Interlake harmless from and against the "Toledo Coke Liabilities." Section 4.1 of the Agreement provides in relevant part:

4.1 *Indemnification of Seller.* Buyer shall indemnify, defend and hold harmless Seller from and against all actions, suits, proceedings, judgments, de-

mands, costs and expenses of any kind or nature whatever (including all legal fees and expenses) which directly or indirectly relate to or arise out of (a) any of the Toledo Coke Liabilities. . . .

> Interlake's Answer to First Am. Compl. and Am. Cross-cl. at 25–26.

Interlake notes changes of name from Koppers to Beazer Materials and Services, Inc. (1989), and from the latter to Beazer East, Inc. in 1990. Interlake also notes Beazer's sale of the plant to Toledo Coke in 1987. Interlake further alleges that in May of 1988, the City of Toledo purchased 1.7 acres from Toledo Coke. Paragraph 27 continues:

> 27. ... The City contends that Interlake, Beazer and Toledo Coke discharged or released or caused the discharge or release of hazardous wastes, hazardous substances or other materials into the environment, which have contaminated the area at or by the Plant, and which have otherwise created an imminent and substantial endangerment.

> 28. The City has demanded that Interlake, as well as Beazer and Toledo Coke, pay for any cleanup of the area by or at the Plant that the City alleges is necessary, which is due to the discharge into the environment of hazardous substances, hazardous wastes or other materials by or at the Plant.

> 29. The City's claims against Interlake fall within the liabilities for which Beazer has assumed responsibility and against which Beazer has promised to defend Interlake.

> 30. Pursuant to the Agreement, Interlake demanded that Beazer indemnify, defend and hold Interlake harmless from and against all claims made by the City relating to the discharge into the environment of hazardous wastes, hazardous substances or other materials by or at the Plant. Interlake further demanded that Beazer assume the liabilities for which the City contends Interlake is responsible. Beazer refused and continues to refuse to abide by the terms of the Agreement and denied and continues to deny that it has assumed the liabilities relating to the discharge into the environment of hazardous wastes or

other materials by or at the Plant, despite Interlake's repeated demands.

> 31. Interlake did not retain or assume any liabilities in connection with the discharge into the environment of wastes or other materials by or at the Plant, and Interlake has fulfilled all of its obligations under the Agreement with Beazer.

> *Id.* at 27–28.

Count III ends with paragraph 32:

> 32. Beazer's denial of its assumption of liabilities and its refusal to abide by the terms of the Agreement constitute a breach of the Agreement. As a direct consequence of Beazer's breach, Interlake has incurred and will continue to incur damages.

> *Id.* at 28.

On July 21, 1993 Beazer East, Inc. filed its Answer to Interlake's Amended Cross–Claim. Beazer's denials in its Answer to certain allegations of Interlake, set forth above, put Interlake's allegations at issue. To the extent deemed pertinent to consideration of Beazer's Motion for Summary Judgment and Interlake's Cross–Motion for Summary Judgment, these denials are now set forth.

As to Interlake's paragraph 23, other than admitting that "Interlake, Inc. and Koppers Company, Inc. executed an agreement ... attached as Exhibit B to the Cross–Claim," Beazer denies the remaining allegations of paragraph 23. As to paragraph 28, Beazer states, in part:

> It is admitted that the City has demanded that Beazer, along with Interlake and the Toledo Coke Corporation, clean-up the area by or at the Plant.

> Beazer's Answer to Interlake's Am. Cross-cl. at 6.

As to paragraph 29 of Interlake's Amended Cross–Claim Beazer states:

> The allegations of paragraph 29 state a legal conclusion to which no answer is required and are based upon a written document which speaks for itself, to the extent the written document is unambiguous. To the extent a response may be required,

Beazer denies the allegations of paragraph 29.

*Id.* at 7.

As to paragraph 30, Beazer states:

In response to paragraph 30, Beazer admits that Interlake, Inc. has requested Beazer to indemnify, defend and hold Interlake harmless and has requested that Beazer assume liabilities for which Interlake is responsible. Beazer further admits that it denies that it assumed Interlake's liabilities relating to the discharge into the environment of hazardous wastes or other materials at or by the Plant. . . .

*Id.*

As to paragraph 31, Beazer states in part:

. . . . To the extent a response may be required, Beazer denies the allegations of paragraph 31.

*Id.*

## II.

Entitled "Purchase Agreement Between Interlake, Inc. and Koppers Company, Inc. Concerning the Toledo, Ohio Coke Facility," the Purchase Agreement was dated and executed on October 30, 1978. Article I, Section 1.1 of the Purchase Agreement provides for an asset sale.

1.1 *The Toledo Coke Assets.* Subject to, and upon the terms and conditions hereof, Seller shall convey to Buyer, and Buyer shall purchase and acquire from Seller, at the Closing (as hereinafter defined) the Toledo Coke Assets as they shall exist at the time of Closing.

Purchase Agreement at 1.

Article II "Consideration For The Toledo Coke Assets" provides:

2.1 *Purchase Price.* In consideration for the Toledo Coke Assets, Buyer shall pay to Seller (in addition to the assumption of liabilities by Buyer provided for herein) the following (the "Purchase Price"):

(a) $3,400,000; [plus items (b) and (c) ].

*Id.* at 7.

█ At the heart of the controversy is the proper interpretation of Section 3.1(c)(ii) of Article III, "Assumption of Liabilities." The same phrase is repeated in (c)(ii) of the December 15, 1978 Instrument of Assignment and Assumption. Section 3.1, Assumption of Liabilities, which parties rightly call the "preamble", reads:

3.1 *Liabilities to be Assumed.* Upon the terms and subject to the conditions set forth herein, Seller shall assign to Buyer and Buyer shall assume at the Closing by an appropriate instrument of assignment and assumption pursuant to which Seller shall assign to Buyer and Buyer shall assume and agree to be bound and to pay, perform and discharge, or cause to be paid, performed or discharged, all debts, obligations, duties, undertakings, agreements, contracts and liabilities of Seller of any kind or nature whatever, whether direct or indirect, absolute or contingent, which consist of, arise out of, or in any way relate to, any of the following (collectively, the "Toledo Coke liabilities"):

*Id.* at 10.

The "Toledo Coke Liabilities" are thereafter set forth. Subparagraphs of Section 3.1 [repeated in Instrument of Assignment] (a) and (b) both deal with agreements and contracts.

Subparagraph (c) reads in its entirety:

(c) Any law, statute, ordinance, order, rule, regulation, decree, application, permit, agreement (whether executory or partially performed) or commitment whether arising prior to, on or subsequent to the Closing and relating to (i) the occupational health and safety of employees, (ii) the discharge at or by the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers or otherwise, (iii) equal employment opportunities of any employee or other person, (iv) any employee pensions or other benefits to be assumed by Buyer pursuant to Article VI hereof and (v) the employment of security personnel at the Toledo Coke Plant; *provided, however,* that Buyer shall not assume any liability for, or obligation to pay, any fine or penalty arising out of Seller's operation of the Toledo Coke Plant prior to Closing.

*Id.* at 12–13.

First, the parties dispute the introductory language:

> Any law, statute, ordinance, order, rule, regulation, decree, application, permit, agreement (whether executory or partially performed) or commitment *whether arising prior to, on or subsequent to the Closing and relating to* .... [emphasis added.]
>
> *Id.* at 12.

While Beazer did not take up this subject in its first brief of January 3, 1995, Interlake did include the underlined language in the following composite argument in its brief of March 31, 1995.

> The parties agreed that Koppers would assume *"all"* of Interlake's obligations and liabilities "of *any kind or nature whatever"*, whether "absolute or contingent," which relate *"in any way"* to *any law,* statute, ... order [or] "regulation," whether arising *"prior to, on or subsequent to the Closing,* and relating to ... (ii) the discharge *at* or *by* the Toledo Coke Plant of industrial products, waste *or other materials* into the air, streams, lakes, rivers *or otherwise* ...." (Ex. 3, Agreement, ¶ 3.1(c)(ii) (emphasis added)).
>
> Interlake's First Br. at 15–16.

Without referring to this composite quote, Beazer disputes Interlake's combining words from Section 3.1's preamble with words from Section 3.1(c)(ii). Beazer states:

> The introductory language of § 3.1(c) states "[A]ny law, statute, ordinance, order, rule, regulation, decree, applications, permit, agreement (whether executory or partially performed) or commitment *whether arising prior to, on or subsequent to [the] Closing [and]* relating to: ..."

Interlake nonsensically attempts to argue that the phrase, "whether arising prior to, on or subsequent to Closing ...." contained within § 3.1(c), expands the scope of liabilities enumerated in the preamble. *See* IL Br. at 23–25. In other words, Interlake again ignores the inverted pyramid structure of § 3.1(c)(ii) and reads the preamble as if it read as follows:

> ... all debts, obligations, duties, undertakings, agreements, contracts and liabilities of Seller of any kind or nature

whatever, whether direct or indirect, absolute or contingent, [*whether arising prior to, on or subsequent to Closing,*] which consist of, arise out of, or in any way relate to any of the following ...

Beazer's Second Br. at 24–25.

The language "whether arising prior to, on or subsequent to Closing and relating to" only appears in the introductory language of Section 3.1(c) and not in the preamble. However, in the preamble the same verbs "arise" and "relate" are also used. In pertinent part, the preamble of Section 3.1 reads:

> ... Buyer shall assume ... all ... liabilities of Seller of any kind or nature whatever, ... which ... arise out of, or in any way relate to, any of the following (collectively, the "Toledo Coke Liabilities"):
>
> Purchase Agreement at 10.

██ Rules of contract construction require that "effect should be given to all of [a contract's] words if this can be done by any reasonable interpretation" and "[w]ords in a written contract are to be interpreted according to their common, ordinary and usual meaning." 18 O.Jur.3d *Contracts* §§ 141 and 157 (1980). Hence, when the same words are used in different parts of a written contract the words should receive the same meaning.

The preamble of Section 3.1 provides that the Buyer shall assume "all ... liabilities of Seller ... which ... arise out of, or in any way relate to, any of the following" (collectively, the "Toledo Coke Liabilities"). "Arise out of" means that the liabilities "originate ... come into being" (Webster's New International Dictionary 148 (2nd ed.)) "out of ... any of the following," (collectively, the "Toledo Coke liabilities"). Accordingly, "Toledo Coke Liabilities" that the Buyer assumes, come out of and relate to any of the matters that are thereafter described in Section 3.1(c)(i), Section 3.1(c)(ii), Section 3.1(c)(iii), Section 3.1(c)(iv) and Section 3.1(c)(v).

With the meaning of "arise out of" and "relate to" in the preamble of Section 3.1 (Instrument) thus established, attention is turned to a construction of Section 3.1(c) in which the same words are used (here underlined).

(c) Any law, statute, ... commitment whether *arising* prior to ... (i) the occupational health and safety of employees, (ii) the discharge at or by the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers or otherwise, (iii) equal employment opportunities of any employee or other person, (iv) any employee pensions or other benefits to be assumed by Buyer pursuant to Article VI hereof and (v) the employment of security personnel at the Toledo Coke Plant; *provided, however,* that Buyer shall not assume any liability for, or obligation to pay, any fine or penalty *arising out of* Seller's operation of the Toledo Coke Plant prior to Closing. (Emphasizing of *arising* and *arising out of* is added to original underlining.)

> Purchase Agreement at 12–13.

Incorporating the construction previously given to the preamble Section 3.1 (Instrument's introduction), Section 3.1(c) is thus construed. The Buyer shall assume all liabilities of Seller which originate from or come into being out of any "law, statute ... or commitment" whether the origin or coming into being of said liability is "prior to, on or subsequent to the Closing" as it relates to (c)(i), (ii), (iii), (iv) or (v).

### III.

Beazer argues:

> The bracketed and italicized "prior to" language ... only appears in the introductory language of § 3.1(c) set forth above, *not* in the preamble. "Prior to" does not refer to "debts, obligations ..." of Interlake which "arise prior ... Closing," but only refers to any "law, statute ... or commitment whether arising prior to ... Closing."

> Beazer's Second Br. at 25.

In support of this argument Beazer then asserts:

> Beazer's interpretation is not only logical but is also in accord with the grammatical rule of the last antecedent. The Ohio Supreme Court has recently recognized that "referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last

antecedent." *Independent Ins. Agents of Ohio v. Fabe,* [63 Ohio St.3d 310, 314], 587 N.E.[2d] 814, 817 (Ohio 1992) (applying the grammatical rule in statutory construction). By application of this logical time-tested tool, the reference in § 3.1(c) to the qualifying terms "whether arising prior to, on or subsequent to the Closing" can only be read to refer to the phrase immediately preceding it: "[A]ny law, statute, ordinance, order, rule, regulation, decree, application, permit, agreement (whether executory or partially performed) or commitment."

> *Id.*

In support, Beazer cites *Independent Insurance Agents of Ohio v. Fabe,* 63 Ohio St.3d 310, 587 N.E.2d 814 (1992). The Ohio Supreme Court states, in pertinent part:

> We are guided by certain basic rules of statutory construction: ... "[R]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent * * *." *Carter v. Youngstown* (1946), 146 Ohio St. 203, 209, 32 O.O. 184, 186, 65 N.E.2d 63, 66.

> *Fabe,* 63 Ohio St.3d at 314, 587 N.E.2d at 817.

While no Ohio case has been found that applies this statutory rule of construction to contractual construction, other courts have done so; and to do so is a reasonable extension of the rule. *See Illinois Bell Tel. v. Reuben H. Donnelley Corp.,* 595 F.Supp. 1192, 1200 (N.D.Ill., 1984).

The *Fabe* rule of statutory construction, applied to contractual construction, contains an important caveat, namely, "Where no contrary intention appears." In this court's analysis, this court has explained that rules of contract construction require that the words "arising" and "relating to" in Section 3.1(c) shall have the same meaning as "arise out of" and "relate to" in the Section 3.1 preamble. Reading together the Section 3.1 (preamble) and Section 3.1(c), *supra,* establishes a "contrary intention" to application of the "last antecedent" rule of construction.

Interlake supplies a further "contrary intention." It correctly observes:

In the present case, a "contrary intention" is evident in the use of the word "arising." Liabilities, obligations and the like "arise"; laws, statutes, ordinances and the like do not. Rather, they are "enacted" or "become effective."

Interlake's Second Br. at 23.

Because of the established "contrary intent", the *Fabe* statutory rule of statutory last antecedent construction will not be applied.

Following the citation of *Fabe*, Beazer contends:

Because the "prior to" language does not extend to the description of the conduct from which the liability being assumed may arise, it does not connote any willingness on Beazer's part to accept any liability for Interlake's pre-Closing conduct (footnote omitted).

Beazer's Second Br. at 25.

*Beazer's* argument, omitting the word "not," reads: "[b]ecause the "prior to" language does [ ] extend to the description of the conduct from which the liability being assumed may arise." It is concluded that the "prior to" language *does* "connote [ ] willingness on Beazer's part to accept [ ] liability for Interlake's pre-Closing conduct."

The "prior to" language does not appear in Section 3.1(a), Section 3.1(b) or Section 3.1(d). The presence of the "prior to" language in Section 3.1(c) and the absence of the "prior to" language in (a), (b) and (d) compels the conclusion that this drafting of these parallel sections was designed and intended by the parties, Koppers, the Buyer, and Interlake, the Seller. Accordingly, it is concluded and determined that whatever liabilities Koppers assumes by Sections 3.1(c)(i), (ii), (iii), (iv) and (v), those liabilities also involve "Interlake's pre-Closing conduct."

 Significantly Section 3.1(a) ends with an exception that reads:

. . . except any liability for, or obligation to pay, any amount arising out of any default thereunder occurring prior to the Closing.

Purchase Agreement at 11.

Similarly, Section 3.1(b) ends:

. . . *provided, however,* that Buyer shall not assume any liability for, or obligation to pay, any amount (x) arising out of any default under any such agreement, contract, commitment or understanding occurring prior to the Closing or (y) subject to Section 5.2 hereof, for any goods or services consumer prior to the Closing or which do not constitute part of the Toledo Coke assets.

*Id.* at 12.

Similarly, Section 3.1(d)(ii) specifies:

. . . *provided, however,* that this section 3.1(d)(ii) shall not be construed to alter or modify the liability, if any, as between Buyer and Seller under the laws of the State of Ohio for damages in respect of any so-called latent disease for which a claim is made subsequent to the Closing and which is alleged to have resulted from employment at the Toledo Coke Plant both prior to and after the Closing.

*Id.* at 13.

In contrast, the ending "proviso" of Section 3.1(c) is a limitation of the liabilities of Interlake that Koppers assumed by the "prior to" language of Section 3.1(c). This "proviso," the inclusion of which confirms the agreement of Beazer to accept liability for Interlake's pre-Closing conduct, states:

. . . *provided, however,* that Buyer shall not assume any liability for, or obligation to pay, any fine or penalty arising out of Seller's operation of the Toledo Coke Plant prior to Closing.

*Id.*

Further, Beazer argues:

. . . Beazer's interpretation of the "prior to" language is consistent with the use of the term "prior to" elsewhere in the Agreement. *See, e.g.* Article V; § 5.3(b); § 5.6; § 6.1; § 6.1(b)(i); § 6.1(b)(ii); § 10.1; § 10.2; § 10.3. In each of these instances, the term "prior to" refers to the period between the signing of the Agreement and the Closing, *i.e.,* the "Transition Period." In interpreting the language of § 3.1(c) under Ohio law, this Court must interpret the Agreement's separate provisions in light of, and consistent with, the remainder of the Agreement. *See, e.g., Ford Motor Co. v. John L. Frazier & Sons Co.* [29 O.O.2d 379, 8 Ohio App.2d 158], 196

N.E.2d 335, 337 (Ohio Ct.App.1964); *Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.,* 16 F.3d 684, 686 (6th Cir. 1994).

Beazer's Second Br. at 25–26.

This court agrees with the cited rule of contractual construction. Indeed, this court applies this among other rules of construction in holding that the critical words of the introduction of Section 3.1(c) must be given the same meaning as the critical words of the preamble (3.1). However, reliance on the several cited sections of the Purchase Agreement that relate to Closing and the period between the executing of the Purchase Agreement on October 30, 1978 and the Closing on December 15, 1978 (the "Transition Period"), must fall by the wayside. The controlling document is not the Purchase Agreement which uses the term "Closing" in numerous places. Rather, the controlling document is the "Instrument of Assignment and Assumption" which does *not* use the term "Closing." Indeed, Article III, Assumption of Liabilities, Section 3.1 *Liabilities to be Assumed,* recognizes that the "Instrument" rather than the "Purchase Agreement" shall control. Thus, the Purchase Agreement states:

Upon the terms and subject to the conditions set forth herein, Seller shall assign to Buyer and Buyer shall assume at the Closing by an appropriate instrument of assignment and assumption. . . .

Purchase Agreement at 10.

Turning to the "Instrument of Assignment and Assumption" (hereinafter, "Instrument") the introduction starts off differently than the Purchase Agreement Section 3.1 *Liabilities to be Assumed.* But the follow-up wording, here quoted, is the same:

INTERLAKE, INC. . . . Seller . . . does hereby assign to [Koppers] Buyer, and Buyer for good and valuable consideration had and received of Seller as provided in the Purchase Agreement, does hereby assume and agree to be bound by and to pay, perform and discharge, or cause to be paid, performed and discharged, all debts, obligations, duties, undertakings, agreements, contracts and liabilities of Seller of any kind or nature whatever, whether direct or

indirect, absolute or contingent, which consist of, arise out of, or in any way relate to any of the following (collectively the "Toledo Coke Liabilities").

Instrument at 1.

However, the underlined words below show the sharp difference between the introduction to Section 3.1(c) of the Purchase Agreement (left) and paragraph (c) of the "Instrument" (right):

(c) Any law, statute, ordinance, order, rule, regulation, decree, application, permit, agreement (whether executory or partially performed) or commitment whether arising prior to, on or subsequent to *the Closing* and relating to . . .

(c) Any law, statute, ordinance, order, rule, regulation, decree, application, permit, agreement (whether executory or partially performed) or commitment whether arising prior to, on or subsequent to *the date hereof* and relating to . . .

The substitution of "the date hereof" for "the Closing" eliminates the need to consider the following argument of Beazer:

In each of these instances [cited sections of the Purchase Agreement], the term "prior to" refers to the period between the signing of the Agreement and the Closing, *i.e.,* the "Transition Period." In interpreting the language of § 3.1(c) under Ohio law, this court must interpret the Agreement's separate provisions in light of, and consistent with, the remainder of the Agreement.

Beazer's Second Br. at 26.

The "Instrument's" paragraph (c), read together with the Instrument's introduction, means that the Buyer (Koppers) shall assume all liabilities of Seller (Interlake) which originate or come into being out of any "law, statute . . . or commitment" whether the origin or coming into being of said liability is "prior to, on or subsequent to [December 15, 1978]." Since the "prior to" language embraces a coming into being of a liability based on a "law, statute . . . or commitment" that is "prior to" December 15, 1978, likewise it embraces such a liability coming into being if it occurred at any time prior to October 30,

1978, the date the Purchase Agreement was signed.

## IV. A.

Attention now turns to the liabilities which the Buyer, Koppers, assumed under the "Instrument's" paragraph (c)(ii). The liabilities which Koppers assumed as the Buyer under (a), (b), (c)(i), (c)(iii), (c)(iv) and (c)(v) are not here at issue. Before reaching the interpretation of the "Instrument's," (c)(ii), it is essential to rule upon several preliminary matters. In its RCRA ruling of June 14, 1995, this court held in part V:

> Accordingly, this court now must and does hold that Beazer has not contributed to the alleged endangerment, and furthermore, defendant Beazer will not be subject to a clean-up order in this court's later consideration of CERCLA Count 1.
>
> . . . .
>
> Having ruled out Defendant Beazer (Koppers) as the source of the benzene contamination on the right-of-way, the court also rules out its successor Toledo Coke, which the evidence has not shown to have had any part in the production or storage of benzene. By a process of elimination among the three different defendants, only the Interlake group of defendants can be the cause or source of the continuing benzene contamination on the right-of-way and the Toledo Coke Property adjacent to the right-of-way. Hence, CERCLA Count One shall proceed solely as to the Interlake defendants.
>
> June 14, 1995 Mem. and Order at 185–187.

In this court's *Interlake's Motion for Clarification Memorandum and Order* of August 29, 1995, this court modified the foregoing holding:

> In short, the holding of *Nurad* [*Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837 (4th Cir.1992)* is twofold: *One,* in both RCRA and CERCLA actions:
>
> > a requirement conditioning liability upon affirmative human participation in con-

tamination ... frustrates the statutory purpose.

> *Id.* at 845.

*Two,* the CERCLA plaintiff need not show that the "leaking" of the hazardous substance on the "facility" was a "sudden event." It is enough to show that at the time the potentially responsible party owned the property, the "leaking" was

> the result of a gradual and progressive course of environmental contamination. . . .

> *Id.* at 846.

Applying these *Nurad* holdings it becomes evident, and it is found, that Beazer (through Koppers) and Toledo Coke are potentially responsible parties. At the time Koppers owned the entire coke plant site (including the Right-of-Way portion Toledo Coke sold to the City in 1988) the Right-of-Way portion was benzene contaminated. This is so because the court found in the Memorandum and Order of June 14, 1995 at page 47 that the Interlake defendants produced and transported presently existing benzene contamination to the Right-of-Way and the adjacent "hot spots." "Disposal" defined in 42 U.S.C. 9601(29) includes "leaking" of "hazardous waste." This term embraces the present benzene contamination of the Right-of-Way and adjacent "hot spots" but this same contamination of this "facility" earlier existed during Koppers' ownership, and during Toledo Coke's ownership of the "facility."

As to said "facility" (i.e., the Right-of-Way and the adjacent "hot spots") the court thus finds that both Beazer (Koppers) and Toledo Coke are potentially responsible parties under § 9607(a)(2).

> Interlake's Mot. for Clarification Mem. and Order at 16–17.

In pressing their indemnity based crossclaims, both Beazer (Koppers) and Interlake recognize the proposition that indemnity agreements that shift CERCLA responsibility between private parties may be entered into between successive owners of property. The Sixth Circuit recognizes that CERCLA Section 107(e)(1)[3] permits such indemnity

---

**3.** CERCLA § 107(e)(1), 42 U.S.C. § 9607(e)(1) provides:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective

agreements. Interpreting this CERCLA section, the Sixth Circuit holds in *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 255 (6th Cir.1994):

> In *Niecko v. Emro Marketing Co.*, 973 F.2d 1296 (6th Cir.1992), this court analyzed CERCLA § 107: [T]he first sentence provides that all parties involved are to be jointly and severally liable to the claimant under the statute. Where the claimant is the government, liability may not be transferred. However, as between the parties allegedly responsible ... "liability may indeed be transferred." *Niecko*, 973 F.2d at 1300–01. Such an interpretation is not inconsistent with the underlying purpose of CERCLA § 107, which "is to ensure that responsible parties will pay for the clean up and that they may not avoid liability to the government by transferring this liability to another." *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 994 (6th Cir.1993) (citing *Niecko*, 973 F.2d at 1300–01).

*City Management*, 43 F.3d at 255.

As seen, the Instrument of Assignment and Assumption was executed December 15, 1978 and its execution closed the sale by Interlake to Koppers of "The Toledo Coke Plant Assets." The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) became effective on December 22, 1980, substantially two years later.

Beazer notes that "[i]n determining whether an asset purchase agreement transfers CERCLA-type liability, the Sixth Circuit applies state law," citing *AM International, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 995 (note 6) (6th Cir.1993) (Beazer's First Br. at 14.). AM International, Inc. (AMI) and International Forging Equipment (IFE) did execute an asset sales agreement in which IFE bought some of AMI's assets. But the source of the dispute between the two parties was a separate agreement executed two years later, pursuant to which Euclid Industrial Center (EIC), the operator of the manufacturing processes, "paid AMI $2.3 million as accord and satisfaction, and AMI provided a release of all claims to EIC and Dziak." Following *Niecko*, cited *supra*, the Sixth Circuit first held:

> ... the ruling of the district court that a release could not be effective to bar AMI's CERCLA cause of action for contribution, must be reversed.

*AM Int'l, Inc.*, 982 F.2d at 995.

The court turned to the effect of the release and the district judge's conclusion, applying Ohio law, that the release was effective to bar AMI's state cause of action. Agreeing that "Ohio law controls [its] inquiry concerning the effectiveness of the release", the Sixth Circuit disagreed with the district court's application of Ohio law. To the extent here relevant, the Sixth Circuit remanded the case to develop a record under Ohio law and "to determine whether the evidence clearly and convincingly establishes that the parties did not intend the release to cover liability for environmental damage in general or the CERCLA cleanup costs in particular." (*Id.* at 997.)

In the present case, The Purchase Agreement does specify that it "shall be governed by and construed in accordance with the laws of the State of Ohio." Ohio law on purchase of assets is now stated.

In *Welco Industries, Inc. v. Applied Cos.*, (1993), 67 Ohio St.3d 344, 617 N.E.2d 1129, following its earlier decision in *Flaugher v. Cone Automatic Machine Co.* (1987), 30 Ohio St.3d 60, 507 N.E.2d 331, the Ohio Supreme Court holds:

> A corporation that purchases the assets of another is not liable for the contractual liabilities of its predecessor corporation unless (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a *de facto* consolidation or merger; (3) the buyer corporation is merely a continuation of the seller

to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing

in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

> *Welco,* 67 Ohio St.3d at 344, 617 N.E.2d at 1130–1131.

The first category is present here, whether "the buyer expressly or impliedly agrees to assume such liability." From this *Flaugher & Welco* statement of Ohio "purchase of assets" law, Beazer proceeds:

> This standard against which to judge whether Interlake's CERCLA-type liabilities were assigned to and assumed by Beazer pursuant to § 3.1(c)(ii) and the Assumption Instrument is consistent with the clarity of expression required under Ohio law for one to agree to indemnify a seller from the legal consequences of the seller's pre-sale activities, *i.e.,* Interlake's own conduct in operating the Toledo Coke facility, including its waste management and disposal practices.

> Beazer's First Br. at 18.

Notably, Beazer recognizes "in any asset purchase" the parties must be "free to contractually allocate liabilities in any fashion they wish." *Erdy v. Columbus Paraprofessional Institute,* 74 Ohio App.3d 462, 466, 599 N.E.2d 338, 341 (1991). Beazer then cites *George H. Dingledy Lumber Co. v. Erie R. Co.,* 102 Ohio St. 236, 242, 131 N.E. 723, 725 (1921) and *Kay v. Pennsylvania R. Co.,* 156 Ohio St. 503, 508, 103 N.E.2d 751, 754 (1952). Paragraphs one and two of the *Kay* Syllabus state:

1. Contracts of indemnity purporting to relieve one from the results of his negligence must be construed strictly.
2. The intention to provide such indemnification must be expressed in clear, unequivocal terms.

> *Kay,* 156 Ohio St. at 503, 103 N.E.2d at 752.

Interlake seeks to parry these cases by citing:

> *Glaspell v. Ohio Edison Co.,* 29 Ohio St.3d 44, 46, 505 N.E.2d 264, 266 (1987). Although such indemnity agreements must meet a heightened standard of being "unequivocal" (Koppers Br. at 18–19) (footnote omitted) and are generally construed nar-

rowly, the rule of strict construction does not apply where the indemnification runs between "commercial enterprises of sufficient size and quality as to presumably possess a high degree of sophistication in matters of contract," and "was assented to in a context of free and understanding negotiation." *Glaspell,* 29 Ohio St.3d at 47, 505 N.E.2d at 266–67.

> Interlake's First Br. at 7.

The *Glaspell* Court first reasons:

> The requirement that this court strictly construe this particular category of indemnity agreement would be unreasonable, in that the rule was developed to guard against a specific practice. Often one party to a contract, being in a position to impose terms upon the other with no realistic opportunity to bargain afforded, would include those standardized clauses in the contract as would unreasonably impose upon the non-bargaining party burdens which were wholly inequitable.... Thus, while clauses limiting the liability of the drafter are ordinarily to be strictly construed, we need not do so when such burden of indemnification was assented to in a context of free and understanding negotiation. *See, e.g.,* Williston on Contracts, *supra,* at 141, Section 1750.

> *Glaspell,* 29 Ohio St.3d at 47, 505 N.E.2d at 266.

In *Kay v. Pennsylvania R. Co.* there is no suggestion that the railroad's contract of indemnity was not enforced because the railroad was a bigger corporation than the Orr Felt Blanket Co.. Rather, the contract of indemnity was not enforced because the contract did not meet the requirements stated in the *Kay* syllabus.

The *Glaspell* Court further rules:

> The parties in the case before us are commercial enterprises of sufficient size and quality as to presumably possess a high degree of sophistication in matters of contract. They all provide services to the general public as their means of producing income and customarily rely on contracts. Each has the financial power to provide against loss by insurance or other means.

Appellants' possession of property for which appellee sought rights of access and use merely describes the ordinary circumstances which give rise to a freely negotiated agreement. That a company bargains from a position of need and would consider it inadvisable to engage in a particular enterprise unless access to specific resources were available cannot be construed as a coercion which offends public policy, especially where, as here, the indemnity clause agreed upon was a most reasonable allocation of the risks of doing business among fellow businesses. Consequently, there is apparently no applicable rule which would require a narrow interpretation of the clause *sub judice.*

*Id.* at 47, 505 N.E.2d at 267.

This last sentence appears to ignore or qualify the *Kay* rule of strict construction of indemnity contracts. Yet, *Glaspell* does not overrule *Kay* or expressly modify its holding.

In *Worth v. Aetna Cas. & Sur. Co.* (1987), 32 Ohio St.3d 238, 241, 513 N.E.2d 253 the Ohio Supreme Court recognizes that an indemnity agreement must be "express" and "unambiguous." Decided September 2, 1987, while *Glaspell* was decided March 25, 1987, the Ohio Supreme Court holds:

When an indemnitor expressly agrees to indemnify an indemnitee except in certain specified instances, and it is determined that the exceptions do not pertain, the indemnitor is obligated to indemnify the indemnitee under the terms of the agreement. *Allen v. Standard Oil Co.* (1982), 2 Ohio St.3d 122, 2 OBR 671, 443 N.E.2d 497, paragraph one of the syllabus. For example, in *Glaspell, supra,* we held that when the subject of liability is anticipated in an enforceable indemnity agreement, such indemnification must be provided. *Id.* at paragraph two of the syllabus. In *Glaspell,* United Telephone Company and Ohio Edison Company ("the appellants") entered into an indemnity agreement with Mahoning Valley Cablevision, Inc. ("appellee") in which the appellants granted to appellee a right to use appellants' facilities and, in exchange, appellee was obligated to bear all risk of additional harm which might occur in connection with appellee's

right of access. Thus, in the event of certain specified contingencies as contemplated by the parties when they drafted the indemnity agreement, the appellee would be responsible for this additional risk of harm. We noted in *Glaspell* that the indemnity agreement was "assented to in a context of free and understanding negotiation." *Id.* at 47, 29 OBR at 396, 505 N.E.2d at 266.

The agreements at issue in the instant case are likewise resolvable by their own terms, and we find the meaning and import of the controverted clauses to be an unambiguous indemnity agreement.

*Worth,* 32 Ohio St.3d at 241, 513 N.E.2d at 256.

Significantly, 18 Ohio Jurisprudence 3d, *Contribution, Indemnity, etc.,* Section 41, published in 1980, but updated by annual supplements, recognizes *Kay* and *Dingledy, supra,* as still the law of Ohio.

§ 41—*Contract of indemnity against consequences of one's own negligence*

Contracts for indemnity against the consequences of one's own negligence must be construed strictly,[58] and will not be held to provide such indemnification unless so expressed in clear and unequivocal terms.[59]

. . . .

58. *Kay v. Pennsylvania R. Co.,* 156 OS 503, 46 O Ops. 417, 103 NE2d 751; . . . .

59. *George H. Dingledy Lumber Co. v. Erie R. Co.,* 102 OS 236, 131 NE 723; *Kay v. Pennsylvania R. Co.,* 156 OS 503, 46 O Ops 417, 103 NE2d 751 . . .

18 O.Jur.3d *Contrib., Indemn.* § 41 (1980).

Accordingly, as the court now undertakes the interpretation of the "Instrument's" paragraph (c)(ii), this court will construe its language so that Koppers indemnifies Interlake only if the indemnity language is express and unambiguous.

### IV. B.

■ The "Instrument's" paragraph (c)(ii) reads:

(ii) the discharge at or by the Toledo Coked Plant of industrial products, waste

or other materials into the air, streams, lakes, rivers or otherwise. . . .

Instrument of Assignment at 3.

Beazer argues:

Interlake assigned to Beazer, and Beazer agreed to assume, only operational compliance obligations. In fact, when this transaction occurred in 1978, CERCLA-type clean-up or remedial obligations were non-existent. Consistently, the language of § 3.1(c)(ii) is directed solely toward Beazer's assumption of Interlake's obligations arising from, and the attendant liability for, a failure to operate the plant in compliance with applicable legal, contractual, and other commitments imposed, or to be imposed, upon the coke plant.

Further, § 3.1(c)(ii) does not address Interlake's CERCLA-type liabilities. First, the Agreement is devoid of any reference to the types of activities which give rise to Interlake's CERCLA-type liability. Second, that the phrase, "discharge at or by the Toledo Coke Plant of industrial products, waste, or other materials into the air, streams, lakes, rivers, or otherwise," is limited to on-going operational compliance obligations is demonstrated by its use elsewhere in the Agreement with reference to "Permits, etc." and capital expenditures, each of which relate *solely* to compliance with legal, contractual, or other commitments imposed, or to be imposed, on the Toledo Coke Plant operations. Further, the use of the phrase, "discharge . . . into" connotes only operational discharges from the coke plant into the air or a body of water beyond the boundaries of the coke plant. Third, the defined term chosen in § 3.1(c)(ii), "Toledo Coke Plant," means, and is used consistently throughout the Agreement with reference to, the operational coke-making facilities. Lastly, the scope of liabilities assumed by Beazer pursuant to Article III and the Assumption Instrument is restricted in time so as not to include liability for Interlake's pre-Closing conduct.

Beazer's First Br. at 4–5.

At this point this court will only address the fundamental question of contractual construction, i.e., the meaning of the language of the "Instrument's" paragraph (c)(ii). Beazer contends that:

the use of the phrase, "discharge . . . into" connotes only operational discharges from the coke plant into the air or a body of water beyond the boundaries of the coke plant.

*Id.* at 5.

Interlake counters:

Koppers' contentions require that several important words be read out of Section 3.1(c)(ii). First the liabilities assumed by Koppers in paragraph 3.1(c)(ii) need only "in any way relate to" a discharge (footnote omitted). Second, the discharge itself may be either "at or by" the Plant, which words hardly support the notion that the parties were only addressing locations "beyond the boundaries of the coke plant." Third, the discharge is identified as "industrial products, waste or other materials." "Waste," of course, is the precise word used in RCRA. [Fourth point discussed *infra* at 40–41.]

Interlake's First Br. at 21–22.

The first step in interpreting the meaning of the "Instrument's" section (c)(ii) is to define "discharge." It is not relevant to resort to a dictionary definition because two statutory definitions were directly known to the parties.

The drafters of (c)(ii), as a matter of law, are charged with knowledge of these definitions. In *The Federal Water Pollution Control Act* originally enacted by Act June 30, 1948, Title V, § 502, as added October 18, 1972 Pub.L. 92–500, § 2, 86 Stat. 886 and amended December 27, 1977, Pub.L. 95–217, § 33(b), 91 Stat. 1577. Section 1362 Definitions, paragraph (12) reads:

(12) The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

. . . .

(16) The term "discharge" when used without qualification includes a discharge of a pollutant, and a discharge of pollutants.

33 U.S.C.S. § 1362.

The "Resource Conservation and Recovery Act of 1976" was enacted as an amendment to the Solid Waste Disposal Act. Section 1004 Definitions, 42 U.S.C.S. § 6903 provides:

(3) The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C.S. § 6903.

One notices that Congress made the words "disposal" and "discharge" interchangeable and equates each word with "placing of any solid waste or hazardous waste into or on any land or water." Alongside of each of these two definitions, this court lays section (c)(ii) of the "Instrument":

(ii) the discharge at or by the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers or otherwise.

Instrument of Assignment at 3.

Separating its components, section (c)(ii) includes: (1) the "discharge," (2) "at or by the Toledo Coke Plant," (3) "of industrial products, waste or other materials," and (4) "into the air, streams, lakes, rivers or otherwise." It is seen that parts (1) and (3) of section (c)(ii) correspond to words in § 6903. In the latter, the term "disposal" is interchangeable with "discharge", and both "disposal" and "discharge" are equated with "placing of any solid waste or hazardous waste into or on any land or water." These words "solid waste or hazardous waste" coincide with the word "waste" in part (3) of section (c)(ii).

With the drafters charged with knowledge of both the definition of "discharge" in 33 U.S.C.S. § 1362(12) and the definition of "disposal" in 42 U.S.C. § 6903, it is reasonable to conclude that of the two definitions, the drafters of section (c)(ii) relied on § 6903(3). It is so concluded because (i) "disposal" is interchangeable with "discharge," and (2) because section (c)(ii) contains the word "waste" found in § 6903 of RCRA. But section (c)(ii) does not use the word "pollutants" from the Federal Water Pollution Control Act Section 1362(12).

Reading § 6903 together with (c)(ii), the construction meaning of (c)(ii) begins with Section 6903. It defines "discharge," read interchangeably with "disposal," as:

placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C.S. § 6903.

Given the above meaning, "discharge" will now be construed together with the "at" and "by" readings of (c)(ii). The first reading of (c)(ii) is keyed by the preposition "at." The second reading of (c)(ii) is keyed by the preposition "by."

The "at" reading states:

(ii) the discharge at ... the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers, or otherwise.

Instrument of Assignment at 3.

Adding the above § 6903 meaning of "discharge," the "at" reading of section (c)(ii) is construed to mean the placing of any solid waste or hazardous waste "at" the Toledo Coke Plant, that is, on the land of the plant, "so that such ... waste ... or constituent thereof may enter the environment or be emitted into the air...." Plainly, a "constituent" of the "waste," benzene contaminated soil, would be volatile benzene gas that "may enter the environment" or "into the air."

The scene shifts to relevant facts previously found in this case in this court's Memorandum and Order of June 14, 1995. This court found:

Thus, Interlake, via gravity, piped to the "Pit" a waste product containing benzene. Plainly, the "Pit" corresponds geographi-

cally to the location near Front Street that is identified by MEC as the "Surface Impoundment." At this "Surface Impoundment," MEC reports that "soil and groundwater samples ... contain extremely elevated levels of benzene." It follows and it is concluded that these benzene laden soil and ground water samples detected in the "Surface Impoundment" area by MEC had been dumped in the same "Pit," years earlier, by Interlake.[7]

---

7. Dr. Robison was similarly cross-examined by Interlake counsel, Mr. Schroeder:

Q. Is benzene impoundment the word that OHM chose to refer to what had previously been described as the surface impoundment?

A. We had found benzene there from previous sampling, and I think the fact that this was where the surface impoundment was, this is where benzene was found, the two terms were combined and being called the benzene impoundment.

Q. Am I right, is that what OHM decided to call it, the benzene impoundment?

A. Yes, I believe that's correct.

Tr. at 935. June 14, 1995 Mem. and Order at 47–48.

The court further found:

No evidence has been introduced that, in the right-of-way's present dormant state, benzene is escaping from the surface into the air. But, further opinion testimony of Dr. Robison indicates that she anticipates that under certain conditions, benzene may escape from the right-of-way.

Q. Dr. Robison, do you hold an opinion whether a removal action or a cleanup for the right-of-way property needs to be taken?

A. Yes.

Q. And what is that opinion?

A. That such a cleanup does need to be undertaken.

Q. And on what do you base that opinion?

A. The fact that existing utility lines are present in this area. Maintenance workers have to be prepared to get into the subsurface for any kind of necessary repairs;

That any construction work that would occur as part of this Front Street project would involve excavation into the subsurface and the fact that we know

that high concentrations of benzene are simply released in an uncontained manner into the environment and are going to be free to migrate by whatever pathways are available.

Tr. at 741–742.

An assumption was then posed:

Q. Would the removal or cleanup action be necessary to be undertaken even if the road were not built?

A. Yes. The only thing that would change is the threat to construction workers would not be present if the road were not built. The other two factors would remain, utility maintenance and general threat to the environment.

Tr. at 742.

Thus, if the proposed widening of Front Street proceeds on the right-of-way, cleaning up the high levels of benzene, in the opinion of Dr. Robison, will cause escape of volatile benzene into the atmosphere and environment. But, even if the road were not built, Dr. Robison is of the opinion that the escape of volatile benzene would occur through utility maintenance, and further, there would remain a "general threat to the environment." In either event, a threat to the environment would be a threat to those working in any excavations on the right-of-way and will require use of safety gear.

*Id.*

The "at" reading of (c)(ii), with the above Section 6903 meaning of "discharge" incorporated, will now be applied to the above facts already found in this case. Interlake placed waste, namely benzene, on the land of the plant. The benzene in the soil, when released as a volatile gas, "may enter the environment or into the air" once excavation of the contaminated right-of-way proceeds, or the contaminated soil is disturbed by utility repairs. It is evident and it is so found that under the "at" reading of Section (c)(ii), when applied to facts already found in this case, Beazer (Koppers) has assumed the coming into being of liabilities based on benzene contamination of the soil prior to December 15, 1978, including liabilities that came into being prior to October 30, 1978, the date the

purchase agreement was signed. Thus, under the "at" reading of Section (c)(ii), such course of events have occurred and would occur within the boundaries of the plant.

The "by" reading of Section (c)(ii) is now considered:

(ii) the discharge ... by the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers, or otherwise.

Instrument of Assignment at 3.

Adding the above § 6903 meaning of "discharge," the "by" reading of (c)(ii) is construed first to have the same meaning as the "at" reading, *supra*. This is true because "the discharge ... by the Toledo Coke Plant of industrial products, waste or other materials into the air" may occur, applying language of § 6903, by the "placing of any solid waste or hazardous waste into or on any land ... so that such ... waste ... or constituent thereof may enter the environment or be emitted into the air." Thus, under the first construction of the "by" reading of Section (c)(ii), the course of events occur within the boundaries of the plant.

A second "by" reading of Section (c)(ii) applies the § 6903 phrase: "discharged into any waters." The "by" reading of (c)(ii) would then project: the "discharge ... by the Toledo Coke Plant of industrial products, waste or other materials into the ...

streams, lakes, rivers." Thus, only the second "by" reading of section (c)(ii) would involve a course of events in which the "discharge ... by the Toledo Coke Plant of industrial products, waste or other materials" would project such substances "beyond the boundaries of the coke plant," as Beazer construes (c)(ii).

This court's "at" reading of Section (c)(ii) and the first of its two "by" readings of Section (c)(ii) forecloses Beazer's categorical contention:

... the use of the phrase, "discharge ... into" connotes only operational discharges from the coke plant into the air or a body of water beyond the boundaries of the coke plant.

Beazer's First Br. at 5.

■ Moreover, as shown by the foregoing analysis, the court's "at" reading of Section (c)(ii) and its "by" reading of Section (c)(ii), when read together with the Section 6903 meaning of "discharge," which, as a matter of law, the parties are charged with employing, demonstrate that the meaning of Section (c)(ii) is express and unambiguous.[4]

Having rejected Beazer's interpretation of Section (c)(ii), and the meaning Beazer says that language "connotes," the court takes up Beazer's arguments that collaterally seek to

---

**4.** Interlake argues that "Koppers' contentions require that several important words be read out of Section 3.1(c)(ii)."

The court now takes up Interlake's further statement:

Fourth, and most importantly, Koppers ignores the words "or otherwise." When used as a pronoun, as it is in paragraph 3.1(c)(ii), "otherwise" means "something or anything else." (Webster's Ninth New Collegiate Dictionary at 836).

Interlake's First Br. at 22.

However, Webster's Third New International Dictionary of the English Language, Unabridged does not include "otherwise" as a pronoun. This dictionary defines "otherwise" as an adverb or adjective. As an adverb "otherwise" means "In a different way or manner."

In its reply brief Beazer does not challenge Interlake's statement that "otherwise" is used as a pronoun. But, it argues:

Ohio law requires the meaning of the general phrase "or otherwise" to be evaluated in light of the specific examples immediately preceding

it, namely "air, streams, lakes [and] rivers," particularly in a contract for indemnity.

Where, in a contract of indemnity, general words follow specific terms, the meaning of the general words will, under the rule of *ejusdem generis*, be limited to things of the same kind, class or nature as those specifically enumerated.

*Kay v. Pennsylvania R. Co.*, [156 Ohio St. 503, syllabus at 3] 103 N.E.2d 751 (Ohio 1952) (Syllabus by the Court at 3).

Beazer's Second Br. at 23–24.

As seen, "otherwise," if used as a pronoun, means "something or anything else," and used as an adverb, "otherwise" means "In a different way or manner." *Neither* of these alternative definitions can be contorted into the *ejusdem generis* meaning of "limited to things of the same kind, class or nature as those specifically enumerated." In short, the rule of *ejusdem generis* is determined not to be applicable. In conclusion, this court's "at" and "by" readings of section (c)(ii) are not affected or changed by the words "or otherwise" which end section (c)(ii).

support its unacceptable interpretation of Section (c)(ii) of the "Instrument."

Beazer correctly states that "when this transaction occurred in 1978, CERCLA-type clean-up or remedial obligations were non-existent." (Beazer's First Br. at 4.) Yet, two pages later, as part of the "Factual Background," Beazer acknowledges in its heading that "Interlake's Conduct ... Gives Rise to its CERCLA–Type Liability." Beazer first summarizes the Interlake Activities and then cites supporting evidence:

> During its nearly seventy years of ownership and operation of the coke plant, Interlake caused the release of various hazardous wastes [the exact words which, as quoted *supra*, are used in 42 U.S.C. § 6903 in defining "disposal" and interchangeably "discharge."] and substances into the environment at the Site.

> Beazer's First Br. at 6.

Beazer continues:

> Many of Interlake's waste disposal and management practices which caused environmental contamination of the Site, and particularly the ROW, were the subject of extensive testimony and briefing during the RCRA § 7002(a)(1)(B) phase of these proceedings.[5] For example, prior to 1978, the Site was part of Interlake's much larger iron-making facility, *see, e.g.*, Romstadt, Tr. at 116–18; P–8, and was used by Interlake for disposal of waste materials generated at the blast furnace end of that facility as well as from coking operations. *See, e.g.*, Romstadt, Tr. at 127–28. . . .

---

5. In fact, the City has specifically detailed the various disposal and operational practices of Interlake which it alleges give rise to Interlake's CERCLA-type liability. *See* The City of Toledo's Closing Trial Brief at 12–17. Beazer likewise summarized the evidence adduced on this issue in Defendant Beazer East, Inc.'s Motion for Judgment on Partial Findings. . . .

> *Id.*

Beazer's recitation of overwhelming proof of Interlake's "environmental contamination of the Site" undergirds Beazer's acknowledgment that "Interlake's [pre–1978] Conduct ... Gives Rise to its CERCLA–Type Liability." Also, Beazer's proof of Interlake's pre–1978 "environmental contamination of the

Site" reinforces this court's reading of Section (c)(ii), *supra*, and shows the pre-December 15, 1978 liabilities that Buyer (Koppers) assumed under the following language of the "Instrument":

> KOPPERS COMPANY, INC. ("Buyer") ... does hereby assume ... all ... liabilities of Seller of any kind or nature whatever ... which consist of, arise out of, or in any way relate to ... (c) Any law, statute ... commitment whether arising prior to, on or subsequent to the date hereof [December 15, 1978] and relating to ... (ii) the discharge at or by the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers or otherwise.

> Instrument of Assignment at 1–3.

Beazer expands its argument under the heading III. B.:

> The Language of Section 3.1(c)(ii) Refers Only to Prospective, Compliance–Oriented Obligations Which are Fundamentally Different From Remedial Clean-up Obligations.

> Beazer's First Br. at 29.

Under heading 1, Beazer asserts:

> The Federal Water Pollution Control Amendments of 1972, 33 U.S.C. §§ 1251–1376 ("FWPCA"), illustrate this prospective, compliance-oriented component of environmental obligations. The FWPCA, *inter alia*, established the NPDES [National Pollutant Discharge Elimination System] permit program. 33 U.S.C. § 1342. Under the NPDES program, facilities discharging "pollutants" to surface waters are required to apply for and comply with permits issued by the federal government and authorized state agencies. Unless special exemptions are granted, discharges from facilities must comply with substance-specific effluent standards. *See National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580, 582–83 (6th Cir.1988). However, the NPDES program does not regulate all manner of *disposal.* Rather, "discharge" under the NPDES program refers only to the effluent streams which flow out of a pipe or other discrete conveyance into a separate body of water. *See*

*United States v. Dean,* 969 F.2d 187, 193–94 (6th Cir.1992), 33 U.S.C. §§ 1362(12), (14). The NPDES program does not regulate the *disposal* of wastes into pits, impoundments, lagoons, or anything else located entirely within an industrial site. *Id.* [footnote omitted].

> *Id.* at 29–30.

This court earlier decided that the drafters of Section (c)(ii), by operation of law, were charged with knowledge of the definition of "discharge" in The Federal Water Pollution Control Act, 33 U.S.C. § 1362(12), as well as the definition of the term "disposal" in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6903(3). This court determined, for the reasons stated, that it was reasonable to conclude that of the two definitions, the drafters of Section (c)(ii) of RCRA relied on the § 6903(3) definition of "disposal" and "discharge" and the equated "placing" language. Hence, this court concludes that the "prospective, compliance-oriented component of environmental obligations," (*Id.* at 29), of the Federal Water Pollution Act are not here relevant. That Act, therefore, does not support Beazer's assertion that "The Language of Section 3.1(c)(ii) Refers Only to Prospective, Compliance–Oriented Obligations." (*Id.* at 29.)

To further support this just quoted assertion, Beazer refers to Sections 5.2(b) and 5.7 of the Agreement, each of which "use language virtually identical to that in § 3.1(c)(ii)." (*Id.* at 38.) Beazer quotes from 5.7 *Permits, etc.:*

> 5.7 *Permits, etc.* Buyer shall use its best efforts to enable it to be substituted for Seller, or succeed to the rights and obligations of Seller, as of the Closing in regard to *all permits, orders, applications, agreements, commitments and decrees to which Seller is subject and that relate to the health and safety of employees or the discharge at or by the Toledo Coke Plant of industrial products, waste or other materials into the air, streams, lakes, rivers or otherwise.* Seller shall cooperate in effecting the foregoing. [Italics added by Beazer.]

> *Id.* at 39.

The court's earlier analysis of the introductory language of the "Instrument of Assignment and Assumption," Section (c) creates a foundation upon which Beazer cannot rest either its broad contention that "The Language of Section 3.1(c)(ii) [Instrument's (c)(ii)] Refers Only to Prospective, Compliance–Oriented Obligations" or the subordinate argument that:

> "discharge" connotes active conduct resulting from the operation of the coke-making facility by Beazer ...

> *Id.* at 39.

This argument assumes the truth of Beazer's final statement in its "Summary of Argument."

> Lastly, the scope of liabilities assumed by Beazer pursuant to Article III and the Assumption Instrument is restricted in time so as not to include liability for Interlake's pre-Closing conduct.

> *Id.* at 5.

With due deference, this statement rests on sand. Instead, this court created what it believes is a bedrock foundation by its analysis and conclusions, *supra* at 21.

> The "Instrument's" paragraph (c), read together with the "Instrument's" introduction, means that the Buyer (Koppers) shall assume all liabilities of Seller (Interlake) which originate or come into being out of any "law, statute ... or commitment" whether the origination or coming into being of said liability is "prior to, on or subsequent to [December 15, 1978]." Since the "prior to" language embraces a coming into being of a liability based on a "law, statute ... or commitment" that is "prior to" December 15, 1978, likewise [the "prior to" language] embraces such a liability coming into being if it occurred at any time prior to October 30, 1978, the date the Purchase Agreement was signed.

As seen, Beazer has acknowledged that under Interlake's "nearly seventy years of ownership," Interlake "caused the release of various hazardous wastes and substances into the environment." (Beazer's First Br. at 6.) Further, Beazer acknowledges that "Interlake's Conduct ... Gives Rise to CERCLA-type liabilities." (*Id.*) In accordance with

this court's analysis and construction of the "Instrument's" Section (c)(ii), "Buyer" (Koppers) assumed these liabilities which factually came into being by Interlake's actions prior to October 30, 1978. Thereafter, the CERCLA liability was established on December 30, 1980, with the adoption of the Superfund Act.

## V.

■ In its second brief (filed September 20, 1995), Interlake notes that *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1309 (D.N.J. 1992), on which "Koppers relied extensively" was reversed in *Hatco Corp. v. W.R. Grace & Co.*, 59 F.3d 400 (3d Cir.1995). Interlake argues:

> This Court of Appeals opinion is, indeed, "highly-instructive," [Beazer's First Br. at 21–22 and n. 16.], for the *Hatco* fact situation is strikingly analogous to the Koppers/Interlake fact situation, and the new opinion addresses many of the issues raised by the pending motions for summary judgment brought by Interlake and Koppers.

Interlake's Second Br. at 10.

This court considers only bullets one and two of Interlake's paraphrasing of the Third Circuit's decision in *Hatco.*

- State law (i.e., the law of New York), rather than federal common law, applied. *Id.*, at 405.
- The documentation between Grace and Hatco was characterized as a "release" rather than a contract of indemnity. This distinction was important, because for a release the burden of establishing intent of the parties was on the releasor (Hatco), while for a contract of indemnity this burden would have been on the indemnitee (Grace). *Id.*, at 405–06.

Interlake's Second Br. at 12.

The Third Circuit confirmed its earlier characterization of the agreement as a "release."

Hatco is attempting to recover sums it spent to meet Grace's asserted liability. However, if the agreement is enforceable, it acts to relieve Grace from payment for matters that Hatco had taken over itself when the parties executed the assumption agreement in 1978. Indeed, as the district

court pointed out, to the extent a document of that nature "prevents a purchaser from asserting a CERCLA claim against the seller, the agreement can be viewed as a 'release.'" *Hatco*, 801 F.Supp. at 1317. *We are in accord with this comment of the district court, and we shall treat the agreement as a release.* (emphasis added)

*Hatco*, 59 F.3d at 406.

Relying on the Third Circuit decision in *Hatco*, Interlake argues:

> Applying the *Hatco* Court of Appeals opinion to the Interlake/Koppers situation produces the following results. First, as in *Hatco*, the relevant documentation for the Interlake/Koppers transaction includes a purchase agreement and an assumption agreement. For all the reasons set forth in the Appellate Court opinion in *Hatco*, the language and structure of section 3.1(c)(ii) of the present Agreement is properly characterized and analyzed as a release, rather than a contract of indemnity. Section 3.1, the only section over which Koppers and Interlake have been arguing, is entitled, "Liabilities to be Assumed," and does not even mention the word indemnity. (The indemnity language in the Agreement is set forth separately, in section 4.1.)

Interlake's Second Br. at 13.

The last two sentences may or may not support Interlake's contention that section 3.1(c)(ii) of the Purchase Agreement may not be a contract of indemnity. Of course, as Beazer observes in its Reply Brief (Second Brief) at page 1, Interlake agrees in its Memorandum Of Law In Support Of Its Cross–Motion For Summary Judgment, at page 5, n. 2, that in "the parties' cross-motions for summary judgment ... the sole issue is whether Koppers assumed, and indemnified Interlake against, CERCLA-type environmental liabilities." (Interlake's First Br. at 5.)

Beazer is right. In note 2, page 5 of Interlake's First brief, Interlake asserts:

> In light of the case law and Koppers' concession, Koppers' appeal to CERCLA's underlying "polluter pays" policy, Koppers Br. at 20, is utterly irrelevant to the par-

ties' cross-motions for summary judgment, in which the sole issue is whether Koppers assumed, and indemnified Interlake against, CERCLA-type environmental liabilities.

*Id.*

Interlake's position in note 2 conforms to its position in its cross-claim. In paragraph 22, Interlake asserts, in part:

22. As part of the Agreement, Koppers expressly promised to assume certain liabilities of Interlake. . . .

Interlake's Cross-cl. at 25.

In paragraphs 23 and 25 Interlake asserts:

23. Pursuant to the Agreement, Interlake and Koppers executed the Instrument of Assignment and Assumption Agreement on [December 15, 1978]. . . . In the Assumption Agreement, Koppers confirmed its commitment to assume all of Interlake's environmental liabilities.

. . . . . .

25. In addition, Koppers agreed to indemnify, defend and hold Interlake harmless from and against the "Toledo Coke Liabilities." . . .

*Id.* at 26.

At no point in its cross-claim does Interlake assert or allege that in either the Purchase Agreement of October 30, 1978 or the Instrument of Assignment and Assumption, Koppers entered into a Release or even suggest or mention what right, claim, or liability for damages of Interlake was being released by Koppers.

Given Interlake's fundamental pleading (namely, its cross-claim), Interlake may not extraneously inject a belated claim of a Release. Interlake may not run with the Indemnity Hare and hunt with the Release Hounds. However, since this court's memorandum does not cite or rely on the *Hatco* District Court decisions, the Third Circuit *Hatco* reversal has no present moment.

### VI.

Upon the grounds stated and the reasons given, this court grants Interlake's Cross-Motion For Summary Judgment and this court denies Beazer's Motion For Partial Summary Judgment.

IT IS SO ORDERED.